Winthrop M. Mayo and Claire M. Mayo v. Commissioner.
Mayo v. Commissioner
Docket Nos. 51549, 56334.
United States Tax Court
T.C. Memo 1957-9; 1957 Tax Ct. Memo LEXIS 243; 16 T.C.M. (CCH) 49; T.C.M. (RIA) 57009; January 23, 1957
*243 1. Petitioner and others formed a corporation in 1935. It lost money almost every year, and between 1935 and 1949 petitioner, from time to time, lent it various sums, totaling $150,569.13. He received over this period repayments in the total amount of $21,738.32, of which $15,000 was in the form of preferred stock of the debtor. In 1949, in order to make the corporate business more salable, petitioner cancelled $100,000 of this indebtedness. Held, on the facts, a bad debt rather than a contribution to capital resulted. Held further, despite testimony as to various enterprises and activities on the part of petitioner, the bad debt is deductible only as a non-business bad debt. 2. Petitioner also guaranteed the payment of certain debts of the corporation. In 1949, 1950 and 1951 he was required to pay various amounts on account of such guarantees. Held, such payments are deductible as non-business bad debts. Putiam v. Commissioner, 352 U.S. 82 (Decided December 3, 1956). William Levenson, Esq., for the petitioners. R. Monroe Schwartz, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in the income tax of petitioners as follows: *244 Year
Amount
1949
$ 9,939.80
1950
15,668.60
1951
2,584.87
The principal issues are as follows: (1) Did the cancellation in 1949 by petitioner Winthrop M. Mayo of a debt in the amount of $100,000 owed to him by Wilder Manufacturing Co., or the original advances in earlier years of such sum, constitute a contribution or contributions to the capital of Wilder Manufacturing Co.? (2) If the foregoing cancellation be found to represent a worthless debt rather than a contribution to capital, is the amount thereof deductible as a business bad debt, as opposed to a non-business bad debt? (3) May petitioner Winthrop M. Mayo deduct without limitation as losses under Section 23(e)(1) or (2), 1939 Code, amounts paid by him to creditors of Wilder Manufacturing Co. on account of his guarantees of its debts, or is the deduction allowable only as a non-business bad debt subject to the limitations of Section 23(k)(4)? Findings of Fact A stipulation filed by the parties is incorporated herein by this reference as a part of our findings. Petitioners are husband and wife, residing at 807 Pleasant Street, Leominster, Massachusetts. They filed joint Federal income tax returns for the calendar years 1949, 1950 and *245 1951 on the cash basis with the then collector of internal revenue at Boston, Massachusetts. The transactions in question are those of the husband, Winthrop M. Mayo, and he will hereinafter be referred to as the petitioner. Petitioner was born in Leominster, Massachusetts, and graduated from Dartmouth College in 1914. Thereafter he was employed by the Royal Comb Company. In 1915 the company was insolvent, and petitioner purchased approximately 40 per cent of its common stock at a purchase price of $7,500. He continued in its employ until 1918, when he enlisted in the Army. The company prospered as a result of the war, and when petitioner returned from military service in 1919 he sold his investment for $15,000. Thereafter, in 1919, petitioner and two others organized the Pyrotex Leather Company (hereinafter called "Pyrotex"), in which petitioner served as president and general manager until 1924. Each of the organizers invested $5,000 in Pyrotex. Petitioner has at all times held 33 1/3 per cent of its outstanding stock. Between 1921 and 1925 petitioner made loans to Pyrotex totalling $22,913.64. Of this amount $7,500 was lent in 1925, when Pyrotex was insolvent. Petitioner did not *246 receive any notes as evidence of his loans. He was repaid in full by 1931. As of December 31, 1954, under petitioner's continued management, the balance sheet of Pyrotex showed a net worth of approximately $556,000. Of this sum, $485,000 represents retained earnings. Petitioner presently devotes approximately 85 per cent of his working time to Pyrotex. In 1949 it occupied about 75 per cent of his time. In 1924, petitioner's father, an attorney and president of the Leominster National Bank, died. His estate, in excess of $250,000, was left in trust. Income was payable to petitioner's mother for life, and the remainder was, upon her death, to go equally to petitioner and petitioner's sister. The estate consisted of personal property, principally stocks and bonds, and real estate, consisting of two commercial buildings and two tenement houses. The commercial buildings are located in the business center of Leominster. They contain stores, offices, apartments, and formerly housed a hotel which petitioner operated until it was discontinued and changed into apartments in 1953. Petitioner's mother died in 1934. In 1928 petitioner purchased for $135,000 a commercial building known as the Richardson *247 Building. It contains two largestores and five stories of apartments, with approximately 20 tenants. Petitioner still owns this building individually, and owns the inherited real properties jointly with his sister. These properties are under his general supervision, but are not operated and managed by him personally. In 1924 and 1925 petitioner and a contractor named Lagoy engaged as joint venturers in the construction of homes in a real estate development. Petitioner invested $5,500 in this venture, and made a profit in the amount of $7,500. From 1924 to 1935 petitioner made loans at various times to a Ford dealer named Andrews and a used car dealer named Bowker. Such loans varied in amount from $500 to $1,500 each, and were all repaid with interest. In 1925 or 1926 petitioner and one Francis Sullivan began to buy and sell stock as partners. The firm became indebted to the Merchants National Bank in the amount of $12,000. After the stock market crash of 1929 petitioner, as a partner, was requested to and did pay the note of the firm evidencing that debt. The proceeds of the note had been used in the partnership business. In 1929 petitioner and others organized the Fitchburg-Leominster *248 Airport, in which petitioner invested $100. During that year petitioner also purchased for $1,000 an enamel plant at a bankruptcy sale. He intended to reorganize the business, and expected that the former owner would raise additional capital and continue in that business. Additional capital could not be so raised, and the plan was abandoned, petitioner suffering the loss of his $1,000 investment. In 1932 the Merchants National Bank, of which petitioner was a director, was closed. The Comptroller of Currency required advances in the total amount of $100,000 in order to reopen the bank. Petitioner advanced $10,000 of this amount, and subsequently received shares of stock therefor. At the time of the advance, petitioner had no specific intent respecting its nature other than the recognition that it was necessary to reopen the bank. He didn't know how his contributions would eventually be treated, nor did he indicate any preference with respect thereto. The Wachusett Shirt Company (hereinafter called "Wachusett") had been organized about 1880. It prospered for a time, but began to decline during some undetermined period. In 1934 petitioner and one Middlemas, at the request of the majority *249 shareholders, undertook to operate Wachusett in order to save it from liquidation. It was agreed that if such operation should prove successful petitioner and Middlemas were to receive the stock of the majority shareholders at a price fixed by a predetermined formula. Petitioner acted as vice president, and one Joslin was employed as president. Petitioner lent Joslin $2,500 in 1934 to enable him to buy stock in Wachusett. Wachusett thereafter prospered, and the former majority shareholders received $15,000 for their shares, petitioner and Middlemas each paying $7,500. After 1940 petitioner continued as a director of Wachusett, but did not continue to be very active in its affairs. In 1937 petitioner lent one Ferguson and one Robertson $1,860 and $600, respectively, to enable them to purchase shares in Wachusett After the purchase Ferguson became Wachusett's treasurer. These loans have been repaid. In 1950 the textile industry in the area had declined. As a condition for the extension of further bank credit petitioner and Joslin each invested $10,000 in preferred stock of Wachusett. The business was finally sold in 1952. During 1936 petitioner made a loan in the amount of $500 to E. *250 Allen. That loan was subsequently repaid. Petitioner and four associates organized Lukon, Inc. (hereinafter called "Lukon") in 1936 for the purpose of manufacturing floor waxes and chemical sizes. Petitioner was its only active officer. As of December 31, 1954, Lukon had total capital in the amount of $107,000, of which $97,000 represented retained earnings. In 1938 petitioner organized the Leominster Civic Trust in order to purchase a factory about to be demolished. Petitioners and others raised $30,000 and purchased the factory, which they sold in 1939 to a manufacturing company. Their action in this matter saved the factory from demolition and introduced new industry into Leominster. During 1939 petitioner made a loan of $500 to one Buckley on a friendly basis to begin an artificial collar business. He also endorsed the note of one Duval, who was thereby enabled to borrow $500 in order to promote a multi-carbon invoice machine. Both the loan to Buckley and that acquired by Duval with petitioner's endorsement have been repaid. Petitioner made a loan of $1,000 in 1945 to a man named Whitney to rehabilitate a farm. This was one of a series of loans to Whitney, who had a record of making *251 repayment. A balance of $150 was still due on the 1945 loan at the time of trial. During 1946 and 1947 petitioner made loans of $1,500 each to William E. Gray and Arlene H. Gray. Neither loan was evidenced by a note. Neither loan has been repaid. During 1947 petitioner and four others organized the Puritan Plastics Corporation with a total capital investment of $6,000. Petitioner became president and is the sole active officer of that corporation. Shapley Brothers and Green's Drug Store are tenants of petitioner, with rentals based upon a percentage of sales. Petitioner made a loan to the former in the amount of $4,000 in 1949 and a loan to the latter in the amount of $3,000 in 1950 to enable them to erect new store fronts. Both loans are without interest and are payable over a period of ten years. Neither is evidenced by a note, but each is written into the lease of the respective tenant. The purpose for which petitioner made such loans was to enable the tenants to increase business by modernizing, and hence to pay greater rentals to petitioner. The work done as a result of the loans in fact increased the business of both tenants. In 1952, after the sale of Wachusett, The Whitney *252 Shirt Company was organized, petitioner receiving 40 per cent of its stock. It was unable to borrow from banks, and petitioner made a loan to it in the amount of $2,000 in the year of its formation. That loan was not evidenced by a note and bore no interest. It is still unpaid. Wilder Manufacturing Company, Inc. (hereinafter called "Wilder") was organized on October 1, 1935, under the laws of the Commonwealth of Massachusetts, to manufacture wooden radio cabinets and other types of furniture. Wilder was organized by petitioner, Ralph A. Joslin and Hugh B. Ferguson. Its authorized capital stock consisted of 250 shares of preferred stock of the par value of $100 per share and 1,000 shares of common stock without par value. It issued 75 shares of preferred stock and 15 shares of common stock, which were held as follows: Preferred
Common
Petitioner
30
6
Ralph A. Joslin
30
6
Hugh B. Ferguson
15
3
Totals
75
15
In 1936 petitioner made a loan to Joslin in the amount of $4,800 to purchase additional stock in Wilder. That loan is still outstanding, but interest has been paid to date. In 1937 petitioner made a loan to Ferguson in the amount of $2,400 to purchase additional stock in Wilder. This loan remains *253 outstanding, although interest has been paid to date. On December 31, 1940, the stock of Wilder was held as follows: Preferred
Common
Petitioner
68
136
Ralph A. Joslin
68
136
Hugh B. Ferguson
44
88
Totals
180
360 On October 24, 1941, Wilder's authorized capital was increased with respect to its preferred stock. Thereafter its authorized capital consisted of 500 rather than 250 shares of preferred stock, all of the par value of $100 per share. There was no increase in the number of authorized shares of common stock. Shortly thereafter petitioner received 150 shares of preferred stock in satisfaction of part of Wilder's indebtedness to him. In December of 1941 he sold 68 shares of the preferred stock of Wilder. These shares eventually came into the possession of his son, Winthrop M. Mayo, Jr. Wilder's outstanding capital stock was thereafter held as follws: Preferred
Common
Petitioner
150
136
Winthrop M. Mayo,
Jr.
68
0
Ralph A. Joslin
68
136
Hugh B. Ferguson
44
88
Totals
330
360
All stock had been subscribed for at a price of $100 per share of preferred stock and 10" per share of common stock. Wilder's agreement of association included the following with respect to its stock: "(a) No share of the common stock of the *254 Corporation shall be sold by the owner without first offering it to the common stockholders. "(b) Holders of the preferred stock shall be entitled to a dividend not exceeding five per centum in any one year which dividend shall be non-cumulative and payable out of net earnings before any dividend is paid upon the common stock. "(c) Whenever the dividends accrued upon the preferred stock shall have been paid or declared and set aside for payment, dividends upon the common stock may be declared out of the balance of the net profits or surplus. "(d) The preferred stock shall be callable in whole or in part on any dividend day, at par, plus unpaid dividends. "(e) The preferred stock shall have no voting power, and the common stock shall have the exclusive voting power of the Corporation. "(f) Upon any liquidation or winding up of the Corporation (whether voluntary or involuntary) the holders of the preferred stock shall receive for their shares the par value thereof plus unpaid dividends thereon before any payment is made to the holders of the common stock, and the remaining net assets shall be distributed among the holders of the common stock." Wilder originally engaged in the business *255 of finishing radio cabinets. Shortly after it began operations, the firm representing its sole source of supply of unfinished cabinets installed its own finishing system, depriving Wilder of its supply. It accordingly became necessary in 1936 to change the nature of its business to include the manufacture and assembly of cabinets. Wartime restrictions prevented the development of its new business until 1945, when a one-year contract was entered into with General Electric Company, which enabled Wilder to operate at a profit for 1946. General Electric Company then began to manufacture its own cabinets, and Wilder changed its own business to the manufacture of juvenile furniture. From the time Wilder was first organized until 1950 petitioner was an officer, stockholder and director. However, he was not active in its affairs. Petitioner made loans to Wilder in various amounts and received repayments from time to time as follows: Year
Loan
Repayment
1935
$ 5,600.00
1938
7,500.00
$ 2,000.00
1939
12,500.00
2,000.00
1940
9,505.00
1941
28,700.00
16,500.00 * *256 1943
5,000.00
1944
12,500.00
1945
25,280.32
1,200.00
1946
8,648.81
1947
7,400.00
1948
17,000.00
1949
10,935.00
38.32
Total
$150,569.13
$21,738.32
The foregoing loans were unsecured, were without interest and were not evidenced by notes. The amounts were used by Wilder in its general operations. Wilder's corporate records show the following net sales and income (loss) for each of the years 1936 to 1949, inclusive: Net Income
Year
Net Sales
(or Loss)
1936
$205,481.76
$ 86.62
1937
206,401.87
(7,334.80)
1938
153,816.43
(9,911.59)
1939
224,813.95
(6,547.32)
1940
230,655.15
(12,801.55)
1941
216,991.60
8,664.18
1942
188,180.68
9,401.08
1943
109,249.93
(18,025.41)
1944
93,534.83
(30,227.99)
1945
103,751.58
(43,177.53)
1946
457,433.02
32,460.67
1947
336,706.74
(14,447.77)
1948
97,447.13
(48,184.73)
1949
83,235.83
(29,687.81)
Its balance sheets show the following financial condition for the years 1935 to 1949, inclusive: Total
Capital
Earned Surplus
Date
Total Assets
Liabilities
Stock
(Deficit)
Dec. 31
1935
$ 10,279.97
$ 6,240.12
$ 7,501.50
$ (3,461.65)
1936
40,535.57
31,886.60
12,024.00
(3,375.03)
1937
41,708.11
33,777.32
18,036.00
(10,105.21)
1938
45,453.08
47,433.88
18,036.00
(20,016.80)
1939
53,747.90
62,276.02
18,036.00
(26,564.12)
1940
66,157.78
87,487.45
18,036.00
(39,365.67)
1941
113,330.80
110,614.49
33,036.00
(30,319.69)
1942
91,268.39
79,151.00
33,036.00
(20,918.61)
1943
72,421.07
78,329.09
33,036.00
(38,944.02)
1944
58,604.47
94,740.48
33,036.00
(69,172.01)
1945
114,603.73
193,917.27
33,036.00
(112,349.54)
1946
153,144.54
199,997.41
33,036.00
(79,888.87)
1947
116,532.36
177,833.00
33,036.00
(94,336.64)
1948
70,180.09
179,665.76
33,036.00
(142,521.37)
1949
36,276.13
75,449.31
33,036.00
(72,209.18)
*257 The immediately preceding figures for the year 1949 reflect the voluntary cancellation by petitioner in that year of $100,000 of the indebtedness due him. By 1947 Wilder appeared to have no prospects of profitable operations. Several attempts were made without success to dispose of its assets or to sell it as a going business. At a special meeting of the board of directors on June 24, 1949, petitioner offered to cancel $75,000 of the indebtedness owed him and to transfer a part of his capital stock to the corporation or to any person capable of bringing into the business the quality of management necessary for profitable operations. None of the other stockholder-directors was similarly willing to surrender a part of his stock, and no further action was then taken with respect to this offer. In the latter part of 1949 a New York firm received an option to purchase Wilder as a going concern. Such purchase required the approval of a labor union with which the prospective purchaser had a contract. The union did not approve and the transaction was never consummated. During the negotiations to sell Wilder in 1949 the plant was in operation on only a minor basis. At the time the foregoing *258 option was given petitioner cancelled $100,000 of the indebtedness due him from Wilder in an endeavor to bring about the sale of its business. Wilder also owed much smaller amounts to others of its stockholders at that time. Those debts were not then cancelled. Wilder continued to be insolvent. In 1950 purchasers were found. On August 31, 1950, petitioner sold his 150 shares of preferred stock to the treasury of Wilder for 25" per share, and his common stock consisting of 136 shares to the purchasers for 10" per share. The new owners took over the business on September 1, 1950, and also paid the retiring stockholders $8,000 to reduce the indebtedness of the corporation. The new owners carried on the business of Wilder, but on March 28, 1952, executed an assignment for the benefit of creditors. When the new owners took over Wilder's business, petitioner cancelled the remainder of its indebtedness to him. Similarly, the smaller debts owing to certain other stockholders were also cancelled. In 1949, 1950 and 1951 petitioner paid debts of Wilder which he had personally guaranteed as follows: Year
Payee
Amount
1949
Kneeland Lumber Company
$1,992.43
1949
W. D. Cowles Lumber Com-
pany
2,500.00
Total for 1949
$4,492.43
1950
W. D. Cowles Lumber Com-
pany
$2,549.43
1950
Lilly Varnish Company
1,213.60 *
Total for 1950
$3,763.03
(Less payment to Lilly Var-
nish Company)
(1,213.60)
Total for 1950 as adjusted
$2,549.43
1951
Lukon, Inc.
$3,163.61
1951
Sherman Waters
2,500.00
Total for 1951
$5,663.61
*259 Petitioner had a 20 per cent stockholding interest in Lukon at the time of the foregoing payment to Lukon on account of Wilder's indebtedness. In the joint return filed with his wife for 1949, petitioner claimed business bad debt losses in the amount of $104,492.43. Of that sum $100,000 represents the amount covered by the foregoing cancellation, and the remaining $4,492.43 represents certain debts of Wilder paid by petitioner pursuant to his guarantees. In the joint return for 1950, petitioner claimed a business bad debt loss in the amount of $65,089.52. Of that sum $62,540.09 represents a claimed business bad debt loss carry-forward from 1949, and the remaining $2,549.43 represents guaranteed debts of Wilder paid by petitioner in 1950. In the joint return for 1951, petitioner claimed a deduction in the amount of $5,663.36 on account of guaranteed debts of Wilder paid by him. Respondent, in his determination of deficiencies, has disallowed all of the foregoing deductions claimed by petitioner. He has allowed, in lieu thereof, a deduction for *260 a capital loss in each of the years 1949, 1950 and 1951, on the theory that all of the foregoing transactions gave rise to non-business bad debts. Petitioner's income tax return for 1950 erroneously lists his basis in the preferred shares of Wilder as $1,500. The correct amount thereof is $15,000. The indebtedness due petitioner from Wilder became worthless in 1949 to the extent of at least $100,000. Neither the original advances of funds to Wilder from time to time, nor the cancellation of $100,000 thereof constituted a capital contribution. The cancellation by petitioner of a part of Wilder's indebtedness resulted in a non-business bad debt. Loans to Wilder were not in the course of a trade or business regularly carried on by petitioner. Payments by petitioner of debts of Wilder guaranteed by him are deductible as bad debts. They represent non-business bad debts, not having been made in the course of a trade or business regularly carried on by petitioner. Opinion RAUM, Judge: Although the Government's brief appears to suggest that 1949 may not be the correct year for the deduction of the worthless debt, that issue is not open in this case. In paragraph 5(c) of his answer respondent *261 admitted an allegation of petitioner that a debt in the amount claimed here as a deduction became worthless in 1949, and no change with respect thereto appears in the amended answer. We hold that respondent is bound by that admission. However, by amended answer, respondent has taken the position that the indebtedness which petitioner cancelled was a contribution to capital and therefore cannot represent a deductible bad debt. We decide this issue in petitioner's favor. Certainly, at the time petitioner made the various advances to Wilder, there appears to have been an intention to make bona fide loans. On the record before us, we reject the notion that petitioner intended to make capital contributions when he made the advances in question. Nor can we accept the Government's contention that the cancellation of the indebtedness was a contribution to capital. Wilder was then hopelessly insolvent, even after the cancellation. Efforts were then being made to sell the business and the cancellation was intended to facilitate the sale. However, in view or the insolvency of Wilder the cancellation did not enhance the value of petitioner's stock. The cancellation simply reflected the practical *262 judgment that an indebtedness in that amount was uncollectible. We conclude that in the circumstances presented by this record the cancelled portion of the amount owed by Wilder to petitioner did not constitute a contribution to capital. Cf. Giblin v. Commissioner, 227 Fed. (2d) 692, 698-699 (C.A. 5). We must therefore treat the $100,000 as a deductible bad debt; and the only question that remains with respect thereto is whether it is deductible in full as a business bad debt, as contended by petitioner, or whether it is deductible as a non-business bad debt, subject to certain statutory limitations, as contended by the Government. [1] *263 On this issue, the burden is on the petitioner and in order to prevail he must show that the loss was sustained in the course of a trade or business in which he was regularly engaged. It is not enough that he show that he was a stockholder or officer in Wilder, or that Wilder was engaged in business, for Wilder's business is not regarded as his business. Cf. e.g., Dalton v. Bowers, 287 U.S. 404; Burnet v. Clark, 287 U.S. 410; Deputy v. Dupont, 308 U.S. 488, 493-494; Hadwen C. Fuller, 21 T.C. 407; Estate of William P. Palmer, Jr., 17 T.C. 702; Jan G. J. Boissevain, 17 T.C. 325; Charles G. Berwind, 20 T.C. 808, affirmed per curiam, 211 Fed. (2d) 575 (C.A. 3); Edward Koppelman, 27 T.C. -; Commissioner v. Smith, 203 Fed. (2d) 310 (C.A. 2). Petitioner recognizes the difficulties presented by the foregoing *264 decisions and has attempted to overcome them by a claim that he was in the business of financing, promoting and organizing business ventures. The issue is essentially one of fact, and must be resolved in the light of the facts and circumstances of this case. Petitioner has attempted to marshal an imposing history of financing, lending, organzing, promoting and managing in support of his contentions. Superficially impressive, the array of facts thus compiled wanes in signficance upon close examination. Some of the loans to which petitioner testified must be treated as "friendly" loans, unconnected with any business purpose of petitioner. In some cases this appears affirmatively from the record; in other instances the record simply fails to establish the contrary. Petitioner bears the burden of proof here and all such loans accordingly fail to add to his proof of a trade or business carried on by him. Two other loans were to tenants, and were for the purpose of increasing rentals from a building owned by petitioner. Conceivably, those loans could be characterized as being in the course of petitioner's trade or business as landlord, but they do not aid in proving the existence of a trade *265 or business of the type petitioner must prove in order to prevail here. Many other transactions also fail to show anything helpful to petitioner; a number of them characterized by him as loans were simply investments. True, petitioner was a man of means, and from time to time made loans to or investments in various enterprises or ventures, some of them of a civic nature, some of them for profit, and some apparently as accommodation for friends or associates. But we think that these investments and occasional loans, even though they were made for profit, fall short of establishing that petitioner was in the business of lending money or financing business ventures. Moreover, it must be remembered that the history presented by petitioner covers a period of approximately 30 years, and that we must not view his activities and transactions out of context, as though they were telescoped into a much shorter period of time. Cf. Hadwen C. Fuller, 21 T.C. 407. On the evidence before us, we find that the loans to Wilder were not made in the course of a trade or business carried on by petitioner, and therefore hold that in respect of the $100,000 indebtedness he is limited to a non-business *266 bad debt deduction under Section 23(k)(4). Related to the foregoing issue is the question whether petitioner may deduct in full the amounts paid by him in 1949, 1950, and 1951 on account of various debts of Wilder which he had guaranteed. He contends that they are deductible in full on either of three alternative grounds: (1) as business losses under Section 23(e)(1); (2) as losses incurred in a transaction entered into for profit under Section 23(e)(2); or (3) as business bad debts under Section 23(k)(1). What we have said with respect to the prior issue is dispositive of the first and third grounds, since we must similarly hold here that to the extent that these provisions are pertinent they do not aid petitioner because he fails to satisfy the "business" requirement. As to the second ground, the matter is ruled by the recent decision of the Supreme Court in Putnam v. Commissioner, 352 U.S. 82 (December 3, 1956), holding that Section 23(k) governs to the exclusion of Section 23(e) in such circumstances, with the result that the amounts in question here are deductible only as non-business bad debts under Section 23(k)(4). Finally, we must decide whether petitioner suffered a capital *267 loss in 1950 in the sale of his stock in Wilder for a nominal price, or whether such stock became worthless in a prior year with the result that the deduction would not be available in 1950. Petitioner's stock interest was subordinate to his claim as a creditor, and we have accepted his position that the debt became worthless in 1949. Obviously, therefore, his stock interest became worthless in 1949 or some prior year, and no deduction may be allowed in respect of its disposition at a nominal price in 1950. Decisions will be entered under Rule 50. Footnotes
*. Includes $15,000 in preferred stock.
*. No amount was claimed in the return with respect to this payment, and it was not raised in the pleadings or by motion to amend the pleadings.↩
1. Internal Revenue Code of 1939. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deduction: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-Business Debts - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩