T. Roland BERNER, George W. Taylor
and Theodore Friedlander, Jr., As Trustees Under the Last Will and Testament
of Herman Gardner, Deceased

v.

UNITED STATES.

Theodore FRIEDLANDER, Jr., As Executor of the Last Will and Testament of
Gertrude Gardner, Deceased

v.

UNITED STATES.

Nos. 298–54, 297–54.

United States Court of Claims.

Oct. 5, 1960.

and 93 percent of the second preferred. The plan of recapitalization called for retirement of the publicly held first preferred stock for cash; exchange of the Gardners' shares of first preferred for long-term debentures; and reduction of the old 7 percent second preferred stock to 5 percent preferred.

Julian S. Bush, New York City, for plaintiffs. T. Roland Berner, James M. Snee and Aaron Lewittes, New York City, were on the briefs.

Benjamin H. Pester, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., for defendant. James P. Garland and Lyle M. Turner, Washington, D. C., were on the brief.

JONES, Chief Judge.

These are consolidated actions for refund of Federal income taxes. The primary issue common to both cases involves the corporate reorganization provisions of the Internal Revenue Code of 1939, and their application to a recapitalization of the Phoenix Hosiery Company in the year 1944. As will be hereinafter more fully set out, by the end of 1943 the Phoenix Company was in financial difficulties, being greatly in arrears on the payment of preferred stock dividends and in its obligation to gradually redeem the preferred stock. It was felt necessary to formulate a plan of recapitalization. Out of the method used, the issues in this case arise.

Of the three classes of Phoenix stock outstanding, the taxpayers (Herman Gardner and his wife, Gertrude) owned approximately 73 percent of the common stock, 33 percent of the first preferred,

The Commissioner of Internal Revenue viewed the transaction involving the first preferred solely as a redemption and determined that the taxpayers had realized long-term capital gains. The exchange of the second preferred stock is not in issue here. The Commissioner rejected the taxpayers' contention that the transaction involving the first preferred was a tax-free recapitalization-reorganization, that under §§ 112(g) (1) (E)[1] and 112(b) (3)[2] the debentures were "securities in a corporation a party to a reorganization," "exchanged solely for stock or securities in such corporation," "in pursuance of the plan of reorganization," and that therefore no gain is recognized for Federal income tax purposes.

Although § 112(g) states that recapitalization is one form of reorganization, the statute does not tell us what recapitalization means. Nor do the Regulations attempt a clear-cut definition. The Supreme Court has stated, however, that

"recapitalization as used in § 112 (g) must draw its meaning from its function in that section. It is one of the forms of reorganization which obtains the privileges afforded by § 112(g). Therefore, 'recapitalization' must be construed with reference to the presuppositions and purpose of § 112(g). It was not the purpose of the reorganization pro-

1. "§ 112. Recognition of gain or loss—
* * * * *
"(g) Definition of reorganization.
"As used in this section * * *—
"(1) The term 'reorganization' means * * * (E) a recapitalization, * *."

2. "§ 112. Recognition of gain or loss—
* * * * *
"(b) Exchanges solely in kind—
* * * * *

"(3) Stock for stock on reorganization. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." 26 U.S.C.A. § 112.

vision to exempt from payment of a tax what as a practical matter is realized gain. Normally, a distribution by a corporation, whatever form it takes, is a definite and rather unambiguous event. It furnishes the proper occasion for the determination and taxation of gain. But there are circumstances where a formal distribution, directly or through exchange of securities, represents merely a new form of the previous participation in an enterprise, involving no change of substance in the rights and relations of the interested parties one to another or to the corporate assets. As to these, Congress has said that they are not to be deemed significant occasions for determining taxable gain.

\* \* \* \* \* \*

"Congress has not attempted a definition of what is recapitalization and we shall follow its example. The search for relevant meaning is often satisfied not by a futile attempt at abstract definition but by pricking a line through concrete applications."[3]

The defendant has taken two alternative positions. It first contends that all of the first preferred stock—the taxpayers' as well as the publicly held—was in fact redeemed, thus taking the transaction out of the scope of the reorganization provisions of § 112. It relies on the fact that there was a gap between the taxpayers' relinquishment of their first preferred stock and their receipt of the debentures. In the alternative, it is contended that, even though the transaction may satisfy the literal language of § 112, it does not satisfy the purpose of the Congress in postponing the tax liability.

In 1939, the entire voting control over the corporation passed from the common stock and vested in the first preferred stockholders because of arrears in divi-

dends on the first preferred stock. The annual dividend requirement on the 7 percent first preferred was $173,082; by the end of 1943, there were dividend arrears of $30.62 per share, for a total of $757,110.12. In addition, as of December 31, 1943, Phoenix was in default, and had been in default for a number of years, in its charter obligation to retire annually 1200 shares of first preferred stock by purchase or redemption at a price not to exceed $115 per share plus dividend arrears.

The second preferred stock, held almost entirely by the Gardners, had an annual dividend requirement of $35,000; by the end of 1943, there were dividend arrears of $84 per share, for a total of $420,000.

Early in 1939, Phoenix's board of directors appointed a committee to consider the possibility of a recapitalization involving the preferred stock. In addition to the dividend arrears and retirement defaults, the outbreak of World War II brought new financial problems. Postwar equipment changes and improvements were estimated to cost over $2,000,000; new raw material inventories would have to be built to meet the anticipated postwar demands.

There is sufficient evidence in the record to show that it was necessary to strengthen the corporation's capital and credit, and that the control of the corporation by the first preferred stockholders and the high dividend rate on the first preferred stock was an impediment to financial stability and a source of credit weakness.

Several solutions were considered by the committee. Full cash redemption, using bank loans to provide some of the funds, was regarded as financially unworkable because the company could not stand the expense. Another plan under study called for exchange of all the first preferred stock, share for share, for a new 5 percent preferred, plus some cash and common stock.

---

3. Bazley v. Commissioner, 1947, 331 U.S. 737, 740, 741, 67 S.Ct. 1489, 1490, 91 L.Ed. 1782.

The plan finally adopted received its impetus from a proposal made by Herman Gardner. Early in December 1943, he suggested to the committee that the publicly held first preferred stock be redeemed for cash, to be financed for the most part by a bank loan, and that he and Mrs. Gardner would take debentures in exchange for their first preferred stock. In a formal letter to the board of directors of Phoenix the Gardners stated that if Phoenix should call the entire issue of first preferred stock at the charter-prescribed price, they would furnish their irrevocable powers of attorney to the corporation authorizing Phoenix to retain the money otherwise payable to them and to issue to them long-term 5 percent subordinate debentures. The corporation was advised by counsel that a formal redemption of the entire issue of first preferred in cash would minimize the possibility of stockholder suits.

Acting on the Gardners' commitment, the board of directors approved the plan for redemption of the first preferred stock. The publicly held first preferred were redeemed with the proceeds of a 5-year partly secured bank loan of $1,700,000 at 2½ percent interest, in addition to some $750,000 of company funds. The redemption of the Gardners' first preferred was accomplished by a 2-day borrowing of $1,190,896.97. The proceeds of this loan were first deposited in the corporation's bank account and then delivered by company check to the redemption agent. On that same day, Phoenix, under the irrevocable powers of attorney from the Gardners, also took possession of their shares of first preferred stock. On the next day, Phoenix presented the stock to the redemption agent, together with the irrevocable powers of attorney, received back the $1,190,896.97, deposited this amount in its own checking account, and drew and delivered its check in repayment of the 2-day bank loan. All other first preferred stockholders were paid off in cash by the redemption agents with the other moneys previously furnished by the corporation. Thus, in form, all of the first preferred stock was redeemed in cash.

Subsequently, the 7 percent second preferred stock, held entirely by the Gardners and one corporate officer, was exchanged for new 5 percent preferred; the $425,916.67 arrears on the 7 percent second preferred was eliminated.

■ It is appropriate at this point to dispose of the defendant's contention that the formal redemption of the Gardners' first preferred stock with the proceeds of the 2-day bank loan—which bridged the gap between the relinquishment of the first preferred stock by the Gardners and their subsequent receipt of the debentures—precludes the application of the reorganization provisions of § 112. This argument, it seems to us, places undue emphasis on the "transitory phases" of this arrangement, and fails to view the transaction in its entirety. Helvering v. Alabama Asphaltic Limestone Co., 1942, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775. There is no question that the board of directors adopted the plan to redeem the first preferred with the understanding that the redemption of the Gardners' first preferred stock was to be only a formality, and that, in actuality, they were to receive, not cash, but debentures. Before the redemption of any of the first preferred stock, the Gardners gave Phoenix, in accordance with their prior commitment letter, the irrevocable powers of attorney. In the circumstances, if the tax consequences here are to "turn on matters of substance rather than technicality or form," as we think they should (Koppers Co., Inc. v. United States, 1955, 134 F.Supp. 290, 297, 133 Ct.Cl. 22, certiorari denied 1957, 353 U.S. 983, 77 S.Ct. 1279, 1 L.Ed.2d 1142), this transaction must be treated as an "exchange" of preferred stock for debentures within the meaning of § 112(b) (3).

■ It is, of course, not enough that the taxpayer satisfies the provisions of § 112 "treated as inert language." "Unless a transaction is a reorganization contemplated by § 112(g), any ex-

change of 'stock or securities' in connection with such transaction, cannot be 'in pursuance of the plan of reorganization' under § 112(b) (3)." Bazley v. Commissioner, 1947, 331 U.S. 737, 740, 741, 67 S.Ct. 1489, 1491, 91 L.Ed. 1782. The "continuity of interest" test is one of the barriers raised to deny the benefits of the reorganization provisions of § 112 to transactions not within the purpose of those provisions. Pinellas Ice & Cold Storage Co. v. Commissioner, 1933, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; LeTulle v. Scofield, 1940, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355. It is this test which the Government contends the taxpayer has not met in the case at bar.

In the Pinellas case, the Pinellas corporation had transferred its assets to another company, and had received in exchange cash, and three short-term notes, payable over a period of 105 days. As the notes were paid the Pinellas company immediately distributed the proceeds to its stockholders. The issue there was whether the Pinellas company was taxable on the gain realized on the transaction under reorganization provisions of the Revenue Act of 1926 similar to those found in the 1939 Code. Both statutes provided that the term "reorganization" means "a merger or consolidation." Fairly obviously, what the Pinellas company had done was to sell its assets:

> "It would require clear language to lead us to conclude that Congress intended to grant exemption to one who sells property and for the purchase price accepts well-secured, short-term notes * * *, when another who makes a like sale and receives cash certainly would be taxed. * * * In substance the * * * [Pinellas company] sold for the equivalent of cash; the gain must be recognized." [4]

The primary ground for this decision denying exemption was that there was no reorganization, because without a continuity of interest, there was no "merger or consolidation":

> "[T]he mere purchase for money of the assets of one Company by another is beyond the evident purpose of the provision, and has no real semblance to a merger or consolidation. Certainly, we think that to be within the exemption the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes." [5]

LeTulle v. Scofield, 1940, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355, another "merger or consolidation" situation, involved an exchange of stock in one corporation for cash and bonds in another corporation. Holding that this transaction resulted in taxable gain, the Supreme Court made it clear that the *term* of obligations received in exchange was not material in determining continuity of interest:

> "[T]he section [defining "reorganization"] is not to be read literally, as denominating the transfer of all the assets of one company for what amounts to a cash consideration given by the other a reorganization. We have held that where the consideration consists of cash and short term notes the transfer does not amount to a reorganization within the true meaning of the statute, but is a sale upon which gain or loss must be reckoned. [Citing the Pinellas case.] * * *
>
> "In applying our decision in the Pinellas case, supra, the courts have generally held that receipt of long term bonds as distinguished from short term notes constitutes the retention of an interest in the purchasing corporation. * * *
>
> "We are of opinion that the term of the obligations is not material. Where the consideration is wholly in the transferee's bonds, or part cash and part such bonds, we think

4. 287 U.S. at page 469, 53 S.Ct. at page 259.

5. 287 U.S. at page 470, 53 S.Ct. at page 260.

it cannot be said that the transferor retains any proprietary interest in the enterprise. On the contrary, he becomes a creditor of the transferee * * *." 6

On the basis of the LeTulle case the Government in the case at bar argues that the reorganization to be exempt must be such that the parties retain their interests in the corporation, and concludes that there is no continuity of interest here since "none of the first preferred stockholders retained any interest in the corporation, *by reason of their ownership of the first preferred stock.*" (Emphasis supplied.)

The court does not believe, however, that the continuity of interest test—which originated in a case construing the words "merger and consolidation"—can be applied automatically to a recapitalization-reorganization situation. Obviously, the test is a *means* for denying tax benefits to transactions which are outside the intended scope of the reorganization provisions, but are encompassed by the literal language of those provisions; it is not an end in itself. In LeTulle it was used as a means to prevent the sale of a corporation's properties for the equivalent of cash from masquerading as a tax-free reorganization. That problem is not present in the case at bar. There are authorities holding that, because of this distinction, it is never applicable to a recapitalization situation. Commissioner of Internal Revenue v. Neustadt's Trust, 2 Cir., 1942, 131 F.2d 528; Davis v. Penfield, 5 Cir., 1953, 205 F.2d 798; Daisy Seide, 1952, 18 T.C. 502.

 The Government contends that there can never be a recapitalization where—as in the case at bar—preferred stock is exchanged for debentures, because of a failure of continuity of interest. But it has failed to point to the evil which this blanket application of the test is supposed to prevent. On analysis, we believe the facts show that the recapitalization involved here fully "par-

takes of those characteristics of a reorganization which underlie the purpose of Congress in postponing the tax liability." Bazley v. Commissioner, 331 U.S. at page 741, 67 S.Ct. at page 1491. In any event, if, in theory, continuity should be required it would seem that here, as in Penfield v. Davis, D.C., 105 F.Supp. 292, "the interest of the holders of a preferred stock limited to fixed dividends and par was fairly reflected in the highly equivalent characteristics of the debentures, into which the preferred was converted." Penfield v. Davis, 105 F.Supp. at page 311. Furthermore, the taxpayers in the case at bar not only retained a majority of the common stock, but, as an incident to the redemption of the publicly held preferred stock, corporate control was returned to the common stock. The net effect of the transaction was to increase the taxpayers' interest in the corporation.

Aside from the issue of applicability of the continuity of interest test, the question remains whether the preferred stock was exchanged for debentures in pursuance of the plan of recapitalization-reorganization. We are convinced that the plan adopted by Phoenix involving the exchange of both classes of preferred stock for "stock or securities" fits the general definition of a "recapitalization" as a "reshuffling of a capital structure within the framework of an existing corporation" (Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 202, 62 S.Ct. 546, 552, 86 L.Ed. 789), and that this recapitalization satisfies the objective of the Congress in exempting "legitimate reorganizations, required in order to strengthen the financial condition of the corporation." (H.R.Rep. No. 704, 73d Cong., 2d Sess. 14 (1934), relating to similar provisions of the Revenue Act of 1934.) The dividend arrears were eliminated, the interest requirements on the bank loans were lower than the dividend requirements on the retired stock, Phoenix received a substantial tax benefit from the substitution of interest-bearing

6. 308 U.S. at pages 420–421, 60 S.Ct. at page 315.

debentures for the taxpayers' preferred stock, and the corporate control was returned to the common stock.

The Government, in fact, does not dispute the business advantages to the corporation resulting from the exchange. Nor does it contend that the exchange had the effect of the distribution of a taxable dividend within the meaning of § 112(c). Cf. Wolf Envelope Co., 1951, 17 T.C. 471; Knapp-Monarch Co., 1942, 1 T.C. 59, affirmed 8 Cir., 1944, 139 F.2d 863; Skenandoa Rayon Corp. v. Commissioner, 1940, 42 B.T.A. 1287, affirmed, 2 Cir., 1941, 122 F.2d 268, certiorari denied 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 556.

■ We therefore conclude that, since the exchange in issue here satisfies both the literal language and the purpose and objective of the reorganization provisions of § 112, no gain should be recognized.

We turn now to the questions relating solely to No. 298–54, involving 1945 taxes. As to the question involving the loss carry-forward, since we hold that no gain should be recognized on the exchange of the preferred stock for the debentures, the Government concedes that the plaintiffs are entitled to a loss carry-forward to 1945.

The facts relating to the remaining question may be briefly stated; they are spelled out in more detail in the findings of fact. In October 1944, Herman Gardner was president of Phoenix, as well as its controlling stockholder. In that month, Gardner personally granted, as an incentive, written options to key executives and employees of the company to purchase from him stipulated numbers of shares of Phoenix common stock at a price well below current market and below his cost basis.

In the year 1945, the options were exercised by two employees—Mr. Horowitz, the vice president in charge of eastern sales, and Mr. MacIver, vice president and assistant general manager. They purchased from Mr. Gardner 300 shares of common stock at $5 per share. At the time of the purchase the shares were selling on the New York Stock Exchange at $27.50 and $29.68, respectively. Mr. Gardner deducted $6,993, the difference between the market price and the amount he received for the stock. The Commissioner of Internal Revenue disallowed the deductions.

The plaintiffs contend that the sale of stock by Mr. Gardner to these key employees at a price below its fair market value and below its cost was a deductible expense under § 23(a), or, in the alternative, a deductible loss under § 23(e).[7]

■ There is no dispute here that, despite the substantial common stock holdings of the Gardners, Phoenix and its stockholders were separate taxable entities. This sale to key employees cannot be considered a "trade or business" expense of Mr. Gardner as a stockholder because there is no showing that it was within the "norm of general and accepted business practice." Deputy v. Du Pont, 1940, 308 U.S. 488, 60 S.Ct. 363, 366, 84 L.Ed. 416. We are even less convinced that granting stock options to employees

---

7. "§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:
"(a) Expenses.
"(1) Trade or business expenses.
"(A) In General. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.
*　　*　　*　　*　　*
"(2) Non-trade or non-business expenses. In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.
*　　*　　*　　*　　*
"(e) Losses by individuals. In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—
"(1) if incurred in trade or business; or
"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *."
26 U.S.C.A. § 23.

is an "ordinary" expense of a business which consisted of being president of the Phoenix corporation.

The same considerations require us to hold that the sale of stock below cost to corporate employees is not an "ordinary," "non-trade," or "non-business" expense within the meaning of § 23(a)(2). Low v. Nunan, 2 Cir., 1946, 154 F.2d 261.

■ The Government objects to plaintiffs' alternative claim for a deductible loss under § 23(e) because the claim for refund did not assert losses under that section of the Code. While it is true that the taxpayer did not present his claim to the Commissioner of Internal Revenue on the theory of a deductible loss, we think that the facts presented in the claim for a deductible expense necessarily formed a full and complete factual basis sufficient to draw the Commissioner's attention to the claim now made in this court. National Forge & Ordnance Co. v. United States, 1957, 151 F.Supp. 937, 139 Ct.Cl. 222.

■ As to the merits of plaintiffs' claim, in view of what has already been said in connection with the claim for a "trade or business" expense, the taxpayer is likewise not entitled to a deduction for a loss incurred in "trade or business" under § 23(e) (1).

■ The remaining issue is whether the difference between the sale price of the stock and the taxpayer's cost basis was a loss incurred in a "transaction entered into for profit." § 23(e) (2). There can be no doubt that the transaction in question was entered into for profit. The men granted the option by Gardner had all been with the company for a considerable time and they had proven their ability during that time. As the principal stockholder of the corporation—he owned 73 percent of the common stock—Gardner wished to protect his investment by insuring that the corporation would not lose the services of these key employees. Therefore, as an incentive to these men to continue in the service of the business, the taxpayer sold them the stock in question at considerably less than they would have had to pay on the market.

In similar situations, it has been held that such a transaction is entered into for profit. Kress v. Stanton, 3 Cir., 1952, 196 F.2d 499, affirming D.C.W.D.Pa. 1951, 98 F.Supp. 470. The motivation for the sale by a shareholder of his securities to key employees at a price below market value is quite properly considered to rest on the stockholder's expectation of increased dividends, i. e. profits, to the stockholder, and in the enhancement of the value of those stocks retained by the stockholder. Hence, the transaction is entered into for profit:

"It does not strike me as odd that a portion of the holdings should be sold at a loss in order to obtain an overall profit or financial advantage for the * * * [stockholder] with respect to its remaining holdings." Kress v. Stanton, 98 F.Supp. at page 474.

A fact pattern almost exactly analogous to this was presented to the Court of Appeals for the Second Circuit in the case of Scherman v. Helvering, 2 Cir., 1935, 74 F.2d 742. There, the taxpayer sought to deduct as a loss from his gross income the difference between what the shares originally cost him and the price at which he sold them to his employee. The court, per Judge Learned Hand, concluded that the deduction should be allowed even though the market value of the securities was considerably more than the price which the employee paid to the taxpayer for the shares. We think the Scherman case is controlling here. Cf. Peabody Coal Co. v. United States, 1934, 8 F.Supp. 845, 80 Ct.Cl. 202.

In view of the authorities discussed above, we hold that the action of the Commissioner of Internal Revenue in disallowing the deduction was incorrect.

The plaintiffs in No. 297–54 and No. 298–54 are entitled to recover on the claim arising out of the reorganization in 1944. The plaintiffs in No. 298–54 are entitled to recover on their claim for a

loss carry-forward in the year 1945. Finally, as to that portion of the claim in No. 298–54 wherein plaintiffs seek the deduction of a loss, plaintiffs are entitled to recover under § 23(e) (2). Judgments to this effect will be entered and the amounts of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

DURFEE, LARAMORE, MADDEN, and WHITAKER, Judges, concur.