**TRANSAMERICA CORPORATION for itself and for all members of the Affiliated Group**

v.

**The UNITED STATES.**

**Nos. 90–79T, 91–79T.**

United States Claims Court.

Dec. 18, 1984.

See also 5 Cl.Ct 477.

Cameron W. Wolfe, Jr., San Francisco, Cal., attorney of record, for plaintiffs. W. Reece Bader, George G. Wolf and Orrick, Herrington & Sutcliffe, San Francisco, Cal., of counsel.

Gilbert W. Rubloff, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser, Washington, D.C., of counsel.

## OPINION ON STOCK OPTION ISSUE

PHILIP R. MILLER, Judge:

### Question Presented

Section 421(a) of the Internal Revenue Code of 1954 (I.R.C.) provides generally that if a share of stock is transferred to an employee pursuant to his exercise of a stock option meeting the requirements of § 422(a) (relating to qualified stock options) or § 424(a) (relating to restricted stock options) no income shall result to the individual at the time of transfer of the stock to him, and no deduction under § 162 (relating to trade or business expenses) is allowable to the employer corporation, or its parent or its subsidiary, at any time. Section 421(b) provides, however, that if there is a failure by the individual to meet the pertinent stock holding period requirement of § 422(a)(1) (3 years) or § 424(a)(1) (2 years)—

> then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred.

The question presented is whether or not § 421(b) authorizes a parent corporation to take a deduction from income for the shares of its stock, transferred to an employee of a wholly owned subsidiary corporation pursuant to the exercise of a stock option, which are disposed of short of the required holding period.

### Findings

Pursuant to stock option plans, beginning in 1961, Transamerica Corporation ("Transamerica") awarded to its employees and to employees of its subsidiary corporations duly authorized options to acquire shares of Transamerica common stock. Such options met all of the requirements of either Section 422 or 424 of the Internal Revenue Code.

From time to time, Transamerica sold shares of its common stock to its employees and to employees of its subsidiaries on the exercise of such stock options. However, during 1967–70 certain of these employees made disqualifying dispositions of some of the shares so acquired, i.e., prior to the expiration of the required holding periods.

Some of such disqualifying dispositions were made by employees of Occidental Life Insurance Company ("Occidental"), a wholly-owned subsidiary of Transamerica, who had acquired the stock pursuant to the exercise of options granted to them from 1963 through 1966. As a life insurance company, Occidental was prohibited by I.R.C. § 1504(b) from joining Transamerica in the filing of a consolidated income tax return. In its return, Transamerica, but not Occidental, claimed deductions for such disqualifying dispositions by Occidental employees, as follows:

| Year | Amount |
|------|--------|
| 1967 | $ 29,897 |
| 1968 | $259,074 |
| 1969 | $129,631 |
| 1970 | $ 14,947 |

In a statutory notice of deficiency, the Commissioner disallowed the deductions claimed by Transamerica for disqualifying dispositions by employees of Occidental for the reason that Section 421(b) of the Code does not authorize a deduction in respect of a disqualifying disposition which does not give rise to a deduction by Transamerica

for compensation under Section 162 (limiting such deductions to ordinary and necessary expenses in carrying on the taxpayer's own business). Alternatively, the Commissioner invoked Section 482 of the Code to reallocate the Section 421(b) deductions in respect of such disqualifying dispositions to Occidental.

During the years 1963 through 1966, Transamerica embarked on a substantial program of reorganization whereby many activities previously dispersed through its subsidiaries were centralized in Transamerica. As a result of this reorganization, Transamerica changed its role from a passive holding company to an active functioning management company, and Transamerica substantially diversified the nature of the businesses conducted by its subsidiaries. During those years, Transamerica also embarked upon a program of significant expansion, accomplished through the acquisition of various subsidiaries, through the formation of new subsidiaries and through the expansion of previously-owned subsidiaries.

In the early 1960's, Occidental was the major profitable Transamerica subsidiary. Occidental paid the salaries, other cash compensation and fringe benefits of Occidental employees; but Occidental never granted options for its stock to its employees and never purchased Transamerica shares for grant to its employees.

The purposes of the Transamerica stock option plans were to provide an incentive to employees of Transamerica and its subsidiaries to perform more efficient and profitable activities, which would redound to the advantage of the entire group of corporations, and thereby to benefit the shareholders of Transamerica; to increase incentive and encourage stock ownership on the part of key employees of Transamerica and its subsidiaries; to provide such employees with or to increase such employees' proprietary interests in Transamerica; and to encourage such employees to remain in the employ of Transamerica or its subsidiaries.

The decisions whether or not to grant options, to whom such options were to be granted, and the numbers of options to be granted to an individual employee were made by Transamerica's Board of Directors on the basis of recommendations by Transamerica's Stock Option Committee (the "committee"), a committee of the Board composed of independent (outside) directors.

The allocation of options among the various subsidiaries was made in the following manner: First, there was a judgment factor, which took into account the importance of the subsidiary to Transamerica's future earning outlook, market price of Transamerica stock and the position of the subsidiary to improve overall earnings by reason of team play, plus inter-subsidiary referrals of business. Thus, for example, Occidental, being in a position to materially affect Transamerica's earnings, corporate image, stock price and inter-family relationships, received more options than other subsidiaries. Second, there was weighed the parent company's investment in each individual subsidiary, as well as the subsidiary's past and expected profitability. Third, after the allocation among the subsidiaries was made, Transamerica's management (Messrs. Horace Brower, Chairman of the Board of Transamerica and president and chief executive officer of Occidental, and John Beckett, president of Transamerica from 1960 to 1965 and chief executive officer thereafter) wrote down the number of options which they felt should be granted the chief officers of the key subsidiaries. The management of each subsidiary was then given the opportunity to propose how the remainder of the options allocated to their company should be distributed among the other employees. The subsidiary's management would thoroughly discuss their recommendations with Beckett, who, in turn, would confer with Brower. Lastly, once these discussions were concluded and agreement was reached on any differences, Transamerica's management recommended the allocations to the committee.

In reviewing the recommendations for grants of options made by the subsidiaries'

management, Brower and Beckett basically confined their analysis to the key people. They attempted to evaluate these employees on the basis of their potential to make contributions to the Transamerica group, consisting of both the parent company and its subsidiaries.

Since Messrs. Brower and Beckett were only able to assess senior executives, they relied primarily on the judgment of the heads of the various subsidiaries who had intimate knowledge of each individual's case.

The committee recommended employees to be recipients of stock options as a long-term incentive for future performance rather than as a reward for past services. Accordingly, most of the grants were made to younger employees and only a few employees 60 years of age or older received options. To a substantial degree the committee correlated options with the salaries of the optionees. The committee also took into account the ability of the employee to pay for stock acquired upon the exercise of an option, the concern being that the grant of the option should not cause the employee to take on excessive debt to finance the purchase. The committee's philosophy further contemplated that the grant of an option would inspire the employee to become a "team player" and cause him to adopt a "shareholder" outlook, thereby increasing his interest in the profitability of the whole corporate family rather than in just the subsidiary which employed him. It was also felt that the grant of an option would instill in the optionee a feeling of being part of the entire Transamerica team and diminish the prospect of his leaving the family of companies.

None of Occidental employees who made disqualifying dispositions in the years 1967–70 was an employee of Transamerica; each was employed by Occidental on a full-time basis. In a few instances some of such Occidental employees were assigned incidental work that related directly to Transamerica's affairs, or because of their particular field of expertise were called upon to advise the officers of Transamerica in such matters as investments, corporate acquisitions and speech writing; but 'the evidence does not indicate how much time any of these people devoted to these activities, nor does it indicate that there was any relationship between such services and the stock options. Various of Occidental's employees also worked, sporadically, on projects or other matters related to the business of Transamerica's other subsidiaries. Generally, the benefit that Transamerica derived from these services was derivative, through its ownership of the subsidiaries' stock. Occidental paid the entire salaries of such employees, including those who occasionally rendered services to other companies within the corporate family, because their primary and predominant function was to perform and work for Occidental on a full-time basis.

### Discussion

Plaintiff maintains that I.R.C. § 421(b) authorizes a deduction to a parent corporation when an employee of a subsidiary who, after having purchased stock of the parent pursuant to an option received from the parent, sells the stock short of the holding period required by §§ 422(a)(1) or 424(a)(1). However, neither the provisions of § 421(b) nor the statements of Congressional intent in its legislative history supports plaintiff's argument.

Section 421(b) provides:

*(b) Effect of disqualifying disposition.*—If the transfer of a share of stock to an individual pursuant to his exercise of an option would otherwise meet the requirements of section 422(a), 423(a), or 424(a) except that there is a failure to meet any of the holding period requirements of section 422(a)(1), 423(a)(1), or 424(a)(1), then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such

employer corporation in which such disposition occurred.

First, it may be noted that nothing in the language of subsection 421(b) deals with any deduction by any taxpayer other than an *employer* corporation. It does not mention or even assume the allowability of a deduction to the parent of the employer corporation. Second, it does not provide a deduction to any corporation. It merely states that if there is any increase in income of the individual or deduction from the income of an employer corporation attributable to the premature disposition of the stock by the individual, then such increase in income or deduction shall be treated as an increase or deduction in the year of disposition. In other words, it prescribes the taxable year for the increase or deduction if it is otherwise allowable, and is not the source of the increase or deduction treatment, which must be found in the general income and deduction sections. *See* I.R.C. §§ 61 and 162.

The legislative history of the statutory provisions on employee stock options is fully consistent with and supports this construction of § 421(b).

The definitive decision under the law in effect prior to the enactment of § 421 was *Commissioner v. Smith*, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, *reh'g denied*, 324 U.S. 695, 65 S.Ct. 891, 89 L.Ed. 1295 (1945). The holding in *Smith* was that, when an employer gave to its employee as compensation for services an option to purchase shares of stock at a price not less than the then value of the stock and the option had no readily ascertainable value at that time, the 1939 Code predecessor of I.R.C. § 61(a), including in gross income "compensation for * * * services", was broad enough to include in taxable income in each year in which the employee acquired stock through the exercise of the option the amount of the difference between the option price and the then market value of the stock. Correlating income and deductions, the 1939 Code predecessor of § 162, allowing an employer a deduction for "compensation for personal services" in carrying on

a trade or business, was held to allow the employer a deduction for the difference between the market value of the stock and the option price at the time of exercise or transfer of the option by the employee. *See Union Chemical & Materials Corp. v. United States*, 155 Ct.Cl. 540, 296 F.2d 221 (1961).

The provisions of I.R.C. § 421(a) first appeared in 130A of the Internal Revenue Code of 1939, as added by the Revenue Act of 1950, c. 994, Title II, § 218(a), 64 Stat. 942. This section provided that if a share of stock is transferred to an individual pursuant to his exercise of a restricted stock option, and no disposition of such stock is made by him within two years from the date of the granting of the option nor within 6 months after the transfer of such share to him, no income shall result at the time of the transfer of such share to the individual upon his exercise of the option and no deduction under 1939 Code § 23(a) (the predecessor to I.R.C. § 162(a)) shall be allowable at any time to the employer corporation of such individual or its parent or subsidiary corporation. However, while § 130A was substantially equivalent to the pertinent provisions of the current § 421(a), it contained no provision similar to § 421(b) relating to the consequences of a disqualifying disposition of the stock by the individual prior to the expiration of the prescribed minimum holding period. Instead Congress indicated its intent and understanding that the pre-existing law with respect to the income and deductions applicable to the exercise of stock options would control. The Senate Finance Committee report stated (S.Rep. No. 2375, 81st Cong., 2d Sess. 98, *reprinted in* 1950–2 C.B. 483, 553):

In the application of subsection (a) of section 130A if, within the period prescribed, the employee disposes of stock acquired under the option, the rules of the subsection respecting income of the employee, respecting deduction allowable to the employer or other corporation, and respecting amount received for the stock do not, of course, apply. Transactions

respecting the option and such stock revert to their status under existing law.

Section 421(b) was added to the employee stock option provisions in 1954 as § 421(f) of the new Internal Revenue Code. The legislative committees reaffirmed the Congressional intent that where the employee disposed of his stock acquired pursuant to a restricted option prior to the expiration of the prescribed holding period, the special treatment applicable to restricted stock options should be lost and the general provisions of law on income and deductions should control. However, since the application of the general principles required burdensome retroactive readjustment of the tax returns for the year in which the option was exercised, the purpose of the new subsection (now § 421(b)) was to change the year of income increase or deduction to the current year of disposition of the stock. The Senate Finance Committee report explained the matter as follows (S.Rep. No. 1622, 83d Cong., 2d Sess. 297, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4936):

> The final change is found in subsection (f) and is intended to facilitate the administration of this section by making any necessary corrections in the year in which a premature disposition of stock acquired under a restricted stock option is made. Presently, when stock acquired under a restricted stock option is disposed of prior to 2 years from the date the option was granted or 6 months from the date the stock was acquired, the special treatment applicable to restricted stock options is lost. In these cases it has been necessary to open returns of the prior year of exercise in order to tax the employee and to allow the employer a deduction whenever permitted by law. This section is intended to make these adjustments more current.[1]

■ As already noted, apart from § 421(a), the general provisions of the I.R.C. with respect to income and deductions for the transfer of stock to employees pursuant to the exercise of stock options, require that they be treated as any other employee compensation. *Commissioner v. Lo Bue,* 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956); *Commissioner v. Smith,* 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, *reh'g. denied,* 324 U.S. 695, 65 S.Ct. 891, 89 L.Ed. 1295 (1945); and *Union Chemical & Materials Corp. v. United States,* 155 Ct.Cl. 540, 296 F.2d 221 (1961).

■ It is well established that a stockholder is not entitled to a deduction under § 162 for compensation paid to the officers or other employees of a corporation for services rendered by them to the corporation. *Deputy v. DuPont,* 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 410 F.2d 1233 (1969); *Berner v. United States,* 151 Ct.Cl. 128, 282 F.2d 720 (1960). In *DuPont,* plaintiff, the owner of 16 percent of the stock of a large publicly owned corporation, sold shares of his own stock at book value to certain of its key executives to increase the efficiency of its management and to conserve and enhance the value of his own stock. The court held that the cost to plaintiff of such a program was not deductible by him as a business expense, because compensating the corporation's employees was a corporate business expense and the law does "not permit any such blending of the corporation's business with the business of its stockholders." *Dupont,* 308 U.S. at 494, 60 S.Ct. at 367. In *Young & Rubicam,* the court held that a parent corporation was not entitled to business expense deductions for salaries, bonuses, profit sharing and other sums paid to employees of its subsidiary corporations for services rendered primarily to the subsidiaries, as "[t]he general and indirect benefit which obviously inures to a parent corporation when one of its subsidiaries successfully performs its functions does not satisfy the requirements of section 162." *Young & Rubicam,* 187 Ct.Cl. at 644, 410 F.2d at 1238. And in *Berner,* plaintiff, who owned 73 percent of the

---

**1.** The House Ways and Means Committee report is substantially identical. H.R.Rep. No. 1337, 83d Cong., 2d Sess. A155, *reprinted in* 1954 U.S. Code Cong. & Ad.News 4017, 4294.

stock of a corporation, was denied deduction as a business expense of the difference between market price and the option price at which he sold stock to key corporate executives and employees of the company as an incentive for them to remain with the company and enhance the value of the plaintiff's stock.

In *Anderson v. Commissioner*, 67 T.C. 522, 548–49, 551, *aff'd per curiam on the basis of the opinion below*, 583 F.2d 953 (7th Cir.1978), the Tax Court analyzed the proper treatment of a parent corporation's transfer of its own stock to the employees of a subsidiary corporation, pursuant to options granted to such employees, as follows:

> [W]ere it not for section 421(a)(2) the employer corporation would be entitled to a deduction for the "spread" between the option price and the fair market value of the stock at the time the option is exercised, even though the stock is stock of the employer corporation's parent. This result is reached by the following analogy of what is deemed to happen.
>
> (a) The parent is deemed to have transferred to the subsidiary-employer an amount of cash equal to the spread between the option price and fair market value of the stock at the date of exercise. This cash represents a contribution of capital by the parent and permits an increase in its basis in the subsidiary's stock.
>
> (b) The subsidiary is deemed to purchase the parent's stock needed to distribute to the employees with the cash received from the parent plus its own funds in an amount equal to the option price. As a result of the transaction the parent has realized no income, [I.R.C.] sec. 1032, and the subsidiary has a basis in the parent's stock equal to its fair market value (the purchase price).
>
> (c) The subsidiary is deemed to transfer the parent stock to its employees in return for services plus the option price.
> * * *
>
> The exercise [of the options by employees of the subsidiaries] with respect to

the parent's stock triggers a capital transaction so far as the parent is concerned. The parent has incurred no true economic expense; it has simply invested additional funds in the form of its stock in the business of its wholly owned subsidiary.

■ Although *Anderson* dealt with qualified stock options, which, because of the provisions of § 421(a), were not deductible by the employer corporation in arriving at taxable income, the courts nevertheless had to determine which corporation was entitled to reduce its earnings and profits for purposes of determining the amount available as a source of taxable dividend distributions. Thus, the question at issue was sufficiently analogous to the one herein to be persuasive. In any event, this court believes the analysis to be correct. A parent corporation's payment of its subsidiary's business expense, whether in cash, in kind or in stock, is not an expense of the parent's business, but a contribution to the capital of or additional investment in the subsidiary and an expense of the subsidiary. *Southern American Gold & Platinum Co. v. Commissioner*, 8 T.C. 1297, 1302, *aff'd per curiam*, 168 F.2d 71 (2d Cir.1948); *Koppers United Co. v. Commissioner*, 2 T.C.M. (CCH) 103, 107 (1943), *aff'd per curiam*, 141 F.2d 1023 (3rd Cir. 1944); *Esmond Mills v. Commissioner*, 132 F.2d 753, 756–57 (1st Cir.1943).

■ Plaintiff makes three arguments in support of the deduction. First, it argues that because § 421(a) provides that where there is a transfer of stock to an individual pursuant to the exercise of a qualified or restricted stock option "no deduction under section 162 (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation", in the event the individual receives the stock of the parent corporation of his employer and then makes a disqualifying disposition of such stock, a deduction is allowable to the parent corporation. The principal difficulty with such argument is that nowhere in the statute is there any provision allow-

ing a deduction to other than the employer corporation. Subsection 421(b), which transfers the deduction from the year of exercise of the option to the year of disposition of the stock, allows the transferred deduction only to the employer corporation. Had Congress intended to allow the deduction to a parent or subsidiary it could readily have said so. The reference in § 421(a) to a parent or subsidiary was meant to give recognition to the fact that the employer's stock may not be available or useful for a stock option, such as when the stock is wholly owned by the parent or is not marketable. Therefore, it allows the employee to receive instead the stock of his employer's parent or subsidiary without having to include its value in his income and correspondingly bars any deduction by *any* corporation for it. As the Senate Committee stated at the time of the original enactment in 1950 (S.Rep. 2375, 81st Cong.2d Sess. 60, *reprinted in* 1950–2 C.B. at 527):

> The benefits of this provision extend to cases where the employee of a parent corporation receives an option to purchase stock in a subsidiary and where the employee of a subsidiary receives an option to acquire stock in a parent corporation.

No reason is given in the 1950 committee reports nor in the 1954 committee reports (when the predecessor of § 421(b) was added) why Congress would have wanted to allow a deduction to the parent rather than to the employer corporation when the employee made a disposition of the stock he had received short of the prescribed holding period, which disqualified him from the benefits of § 421(a).

Next plaintiff relies on Treas.Regs. § 1.421–8(b)(1), which provides:

> *Reg. § 1.421–8 General rules.*
>
> * * * * * *
>
> *(b) Effect of disqualifying disposition. (1)* The disposition of a share of stock, acquired by the exercise of a statutory option before the expiration of the applicable holding period as determined under section 422(a)(1), 423(a)(1), or 424(a)(1), makes section 421 inapplicable

to the transfer of such share. The income attributable to such transfer shall be treated by the individual as income received in the taxable year in which such disposition occurs. *Similarly, a deduction under section 162 attributable to the transfer of the share of stock pursuant to the exercise of the option shall be allowable for the taxable year in which such disposition occurs to the employer corporation, its parent or subsidiary corporation * * *.* [Emphasis added.]

Plaintiff argues that the emphasized portion of this section of the regulations concedes the availability of the deduction to the parent corporation in the event of a disqualifying stock dispositions.

However, in the light of the facts that nowhere in § 421 is there any provision allowing a parent corporation a deduction for a stock option paid as compensation to an employee of its subsidiary, that the tax law generally does not allow a deduction to a parent or controlling stockholder for compensation paid to the employee of a subsidiary for services rendered to the subsidiary, and that the legislative history of § 421 reveals no intent nor reason to allow such a deduction, it would take more than an ambiguity in the regulation to be persuasive to the contrary.

I do not find Treas.Regs. § 1.421–8(b)(1) to be unambiguously in favor of plaintiff's construction. In context the regulation is a construction of I.R.C. § 421(b). As already pointed out, where there has been a disqualifying disposition of stock acquired pursuant to an option, § 421(b) merely shifts the year of a deduction, which would otherwise be allowable therefor under § 162, from the year of the exercise of the option to the year of the disposition of the stock. Hence there is no occasion for the regulation under this section to designate the taxpayer which is entitled to the deduction. Furthermore, the regulation reaffirms that the deduction attributable to the disqualifying disposition of the stock must be allowable under § 162, the general section on compensation. As I read § 1.421–

8(b)(1), it adopts a neutral stance as to the person entitled to the deduction, in effect stating that such determination must be made under § 162, but whether the employer corporation, the parent, or subsidiary is entitled to it, the deduction is allowable only for the taxable year of the stock disposition and not the year of exercise of the option.

Finally, plaintiff contends that the deduction by Transamerica may be justified because the stock options were granted to the Occidental employees in the light of their value to Transamerica, giving them a stake in the company, and as an incentive for the continued performance of future services for Transamerica.

However, the record does not support the notion that the stock options or any measurable portions of them were issued to the employees of Occidental for separable services performed or to be performed for Transamerica other than as employees of Occidental. They worked full-time for Occidental and their entire salaries were paid by Occidental. Indeed, plaintiff concedes that only some of the recipients of the stock options performed any services directly for Transamerica at all. The fact that the employees also benefitted Transamerica derivatively as the sole owner of Occidental does not make Transamerica's costs of the exercise of the stock options its own expenses rather than contributions in aid of Occidental's compensation expenses. In *Young & Rubicam v. United States,* the court stated (187 Ct.Cl. at 644, 410 F.2d at 1238):

> [P]laintiff must prove that the specific services performed by each of the [subsidiaries'] employees involved were for its direct and proximate benefit. The general and indirect benefit which obviously inures to a parent corporation when one of its subsidiaries successfully performs its functions does not satisfy the requirements of section 162.

■ Nor is it significant that the stock options were granted to give the employees a stake in the company or in contemplation of the employees future services rather than for what they had done in the past. When assets are transferred by an employer to an employee to secure better services in the future, it still represents a payment of compensation by the employer to the employee, and it makes no difference that the compensation is paid in stock rather than in money. *Commissioner v. Lo Bue,* 351 U.S. at 247, 76 S.Ct. at 803; *Union Chemical & Materials Corp. v. United States,* 155 Ct.Cl. at 546, 296 F.2d at 224. Since there was no evidence that Occidental was not to continue to be the full-time employer of the employees granted the Transamerica stock options, no evidence of the extent to which it could be reasonably forecast that they would perform other services directly for Transamerica and not for Occidental, and no evidence of any correlation between any such other services and the values of the stock options, it must be concluded that the options were still compensation for services performed and to be performed by the employees directly for Occidental and only indirectly or derivatively for the benefit of Transamerica.

Plaintiff's real complaint appears to be that, during the years at issue, Internal Revenue Code § 802(b) did not permit Occidental to deduct the compensation at issue in determining life insurance company taxable income. But if this is so, it must be deemed a trade-off for other benefits allowed life insurance companies in computing their taxable income, and plaintiff's complaint should more properly be addressed to Congress rather than to the court.

### Conclusion

For the foregoing reasons when all of the issues in this case have been decided, this claim will be dismissed.