Koppers United Company v. Commissioner.
Koppers United Co. v. Commissioner
Docket No. 108436.
United States Tax Court
1943 Tax Ct. Memo LEXIS 304; 2 T.C.M. (CCH) 103; T.C.M. (RIA) 43235; May 13, 1943
*304 John E. McClure, Esq., O. H. Chmillon, Esq., and Edward L. Updike, Esq., for petitioner. William A. Schmitt, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined a deficiency in income tax of $39,302.67 for the calendar year 1936 arising from his disallowance of a deduction of $351,614.31 taken by petitioner on its return for that year as a bonus paid to certain of its key employees and claimed to constitute reasonable compensation for services rendered. Findings of Fact The formal stipulation of facts filed by the parties is included herein by reference. Facts hereinafter set forth which are in addition to those stipulated are found upon evidence presented at the hearing. The petitioner, Koppers United Company, is a voluntary association which was originally organized under the laws of the Commonwealth of Massachusetts on April 24, 1931, under the name of the Fuel Company. By amendments to the Declaration of Trust, the name of the voluntary association was changed on May 8, 1931, to the Koppers Company, and on October 22, 1936, to Koppers United Company, the petitioner herein. The general office of the petitioner is in *305 the Koppers Building, Pittsburgh, Pennsylvania. The return of the petitioner for the year here in question was duly filed with the collector of internal revenue for the twenty-third District of Pennsylvania on July 15, 1937. The term "Koppers Industry" as hereinafter used includes the business of the petitioner and its affiliates, including predecessor corporations and their affiliates. The Koppers Industry was started in the United States prior to 1912 by Heinrich Koppers, a distinguished German engineer and one of the pioneers in the field of by-product coke ovens. This development had its inception in Germany some years before it was introduced into this country by Dr. Koppers. Prior to the introduction of the by-product coke oven, coke, which is a necessary ingredient in the manufacture of pig iron, was made almost entirely in so-called beehive coke ovens which were of comparatively simple construction and made fairly satisfactory coke for certain purposes. Such ovens, however, had no means for saving the rich gases which were produced in the process of coking coal. The introduction of the by-product coke oven designed and patented by Dr. Koppers completely revolutionized the *306 coke industry in that it permitted the capture of the gas and the derivation therefrom, of light oils, tar, ammonia, and miscellaneous products. Thus, there resulted one of the most important industrial developments which this country has witnessed in the past 30 years. In 1912 Dr. Koppers incorporated his business with headquarters in Chicago. In 1914 Henry B. Rust, an engineer of Pittsburgh, Pennsylvania, interested Messrs. A. W. and R. B. Mellon in the purchase of a controlling interest in the Koppers Industry. This was consummated in 1915 and the Mellons and a few associates purchased an 80 per cent stock interest in the Koppers Industry. Headquarters were moved to Pittsburgh and Rust became president. He continued in such office until 1933, and was thereafter Chairman of the Board until his death in 1936. In 1917, during the first World War, the 20 per cent interest which had been retained in the Koppers Industry by Dr. Koppers was taken over by the Alien Property Custodian and thereafter was sold at public auction to the Mellon interests, who thus came into control of a 100 per cent stock interest in the Koppers Industry. Under his contract as president, H. B. Rust was given *307 the privilege of acquiring a 20 per cent stock interest in the Koppers Industry from the other stockholders, which privilege he exercised about 1920. Shortly thereafter, the stock owned by the Mellons and their associates was turned over to McClintic-Marshall Construction Company, stock of which was owned by Messrs. A. W. and R. B. Mellon and Messrs. H. H. McClintic and C. D. Marshall. The stock ownership in the Koppers Industry so remained until by later death or gifts it was split to some extent among members of the families of the original stockholders. After the change in control which took place in 1915 the Koppers Industry started upon a program of extensive development under the leadership of H. B. Rust, its president. Some additional money was put into the enterprise by the stockholders, so that in 1917, when the United States entered the first World War, the consolidated overall balance sheet of the Koppers Industry showed asset of about $15,000,000, including borrowed money. The real growth of the Koppers Industry started with activities incident to the government's war program, and thereafter its progress was one of the outstanding industrial developments of the period *308 from 1917 to 1930. By 1931, through the medium of earnings plowed back into development, and the additional credit thereby created, the consolidated overall balance sheet of the Koppers Industry showed assets approximating $400,000,000. The program of development had put the enterprise into practically all of the fields of industrial activity which were directly related to the by-product coke oven business. A number of so-called merchant coke plants were constructed and owned and operated through subsidiary companies. These plants produced coke as their principal product, and gas, tar, benzol and ammonium sulphate as their principal by-products. The gas was sold in large quantities under long-term contracts to public utility companies. The coke was sold for manufacture of water gas, for making iron and steel and for other related purposes and also, to a major extent, for heating in private homes. Ammonium sulphate was widely sold as a fertilizer. The tar refining became a business in itself and was developed along many ramified lines. Through its subsidiary, American Tar Products Company, the Koppers Industry became one of the principal vendors of road-surfacing material. It even *309 manufactured and sold such things as candles, mothballs, and many other by-products of coal. By-product coke plants were constructed for steel companies all over the country; toluol and benzol plants were constructed for the production of high explosives; a great engineering force was built up which was the largest of its kind engaged in the gas machinery business; and large plants were purchased in connection with this part of the business by the Koppers Industry. Since the enterprise was dealing directly with a number of utility companies in the sale of gas, a logical development was the purchase of utility stocks as an investment, with surplus funds, and the Koppers Industry thus became a very substantial stockholder in a number of the important utilities of the country. Coal was the fundamental natural resource at the bottom of this whole development. Therefore it was a natural step for the Koppers Industry to acquire its own coal properties, and by gradual acquisition it became one of the largest producers of coal in the United States, owning, besides the mines themselves, millions of dollars' worth of equipment such as coal cars, and steamships and barges for water transportation. *310 Thus by 1936, the taxable year here, the Koppers Industry embraced the mining and selling of coal, the conversion of coal into coke, gas, tar creosote, pitch, benzol and numerous other by-products, and the fabrication and construction of machinery and plants for such conversion, together with many incidental activities in business connected with, or which could conveniently be operated in conjunction with such conversion and manufacture. As a necessary incident to this great industrial development a number of able young executives, specially trained, grew up in the Koppers Industry's employment. As they worked and took part in Koppers Industry's growth they naturally became desirous of acquiring a stock interest in the Koppers Industry. To this, H. B. Rust, the president, was sympathetic and over a period of years used his best efforts to bring it about. However, the principal owners, who have already been mentioned, preferred that Koppers Industry pay substantial cash bonuses to such key employees. The amounts of these bonuses for 1925 to 1931, inclusive, were as follows: 1925
$194,700
1926
116,350
1927
239,200
1928
895,950
1929
720,850
1930
675,500
1931
423,200
*311 In 1927 a corporation, known as the Eastern States Securities Corporation, was formed by 25 of the key employees of the Koppers Industry. This number of such employees was increased the following year to 40 and by 1930 had been increased to 58. By 1930 the sum of $1,161,050 had been paid into this company by its 58 stockholders. The purpose of Eastern States Securities Corporation was to enable this group of key employees of the Koppers Industry to participate, in their own interests, in things, which the Koppers Industry itself was doing. As evidence of this the company was permitted to purchase a participation in the American Rheolaveus Company, a major interest in which had been acquired by Koppers Industry for the purpose of developing a process of cleaning coal. It was permitted to acquire on a favorable basis a substantial preferred stock interest in the Hamilton Coke and Iron Company, the common stock of which was jointly owned by Koppers Industry and the American Rolling Mill Company. It was enabled to acquire on a favorable basis a substantial interest in the stock of Eastern Gas and Fuel Associates, which was formed by Koppers Industry in 1929. It was enabled to acquire *312 an interest in Davison Coke and Iron Company in which Koppers Industry was a heavy participant. It was allotted a participation in a cooperative apartment development in New York City in which Rust, the president of the Koppers Industry, Marshall of McClintic-Marshall, W. L. Mellon, and Howard Bruce, one of the directors of Koppers, were substantially interested. It was given participation in financial underwritings by the Union Trust Company of Pittsburgh and by Halsey Stuart & Company of Chicago, both of which participated in the underwritings of securities put out by Koppers Industry. Thus, Eastern States Securities Corporation not only was owned by important employees of Koppers Industry as a group, but efforts were made to afford it an opportunity actually to participate in and to benefit by the activities of the Koppers Industry itself. In the early stages, Eastern States Securities Corporation operated successfully, and by the end of 1929 had investments of $2,537,605, a portion of which had been purchased with borrowed money. At this time it had a paid-in capital of $906,950, with an earned surplus of $608,187. As a result of the depression which started near the end of *313 1929, Eastern States Securities Corporation not only sustained losses, but its portfolio of investments depreciated in value to an alarming extent. As a result thereof, it became necessary for Eastern States Securities Corporation to borrow additional money to protect its margins. The Koppers Company of Delaware (name changed on October 7, 1936 to Koppers Associates, Inc.), one of the corporations of the Koppers Industry and a one hundred per cent owned subsidiary of the petitioner, in the course of its business activities made substantial loans to the Eastern States Securities Corporation. The aggregate amount of those loans on December 28, 1926 was $419,550, with accrued interest of $102,768, a total of $522,318. The total assets of the Eastern States Securities Corporation had a value on that date of $450,614.31. On December 14, 1936, Koppers Associates, Inc., made an offer to Eastern States Securities Corporation to take over substantially all of its assets in satisfaction of the latter's indebtedness, which offer was accepted and approximately $450,000 in assets were conveyed. These assets were at once distributed by Koppers Associates, Inc., as a dividend to petitioner, its *314 sole stockholder. On the following day a resolution was adopted by the executive committee of petitioner reading as follows: RESOLVED, That the President of the company be and he is hereby authorized to distribute to such employees, former employees and widows of former employees of the company as he may select, in such relative proportions as he shall deem advisable, all of the shares of stock recently received by this company as a dividend from Koppers Associates, Incorporated, except the shares of stock of The Kimball National Bank, plus $2,525.00 in cash, as a bonus for services rendered by such employees and former employees of the Company. On December 23, 1936, the petitioner distributed certain of the securities of a value of $278,288.50, together with cash of $73,325.81 or a total of $351,614.31, to certain of the key employees of the Koppers Industry. Some of the recipients of the distribution were employees of petitioner but the great majority were employed by and their salaries paid by the various subsidiary companies which, together with petitioner, made up the so-called Koppers Industry. The recipients were the stockholders in Eastern States Securities Corporation. *315 Four of them were widows of deceased employees and the owners of the stock holdings of their deceased husbands. One distributee was the corporate testamentary trustee, holding the stock of a deceased employee. The amount of the distribution in each instance was in proportion to the recipient's stock holdings in Eastern States Securities Corporation. The total amount of distribution was charged by petitioner against its surplus. No part of it was allocated to or collected from any one of the subsidiary companies of the Koppers Industry. In making its return for 1936 petitioner deducted from gross income the full amount of the aforementioned distribution as a bonus paid its employees. As the parent company of the Koppers Industry petitioner has directed the policy of the subsidiary corporations. Meetings were held twice a month at petitioners' offices in Pittsburgh attended by the key employees in charge of operations of the subsidiary companies. Petitioner has always exercised the authority to transfer the key employees from one subsidiary to another according to its determination as to the advisability of such action. Opinion Petitioner contends that the distributions to key employees *316 and widows of such employees as detailed in our findings of fact were ordinary and necessary expenses, representing reasonable compensation for personal services actually rendered from 1932 to 1936, a period during which bonus payments by Koppers Industry had been discontinued due to the business depression, and during which the salaries of key employees had been reduced approximately 24 per cent. It argues that the distribution was not a donation by petitioner to compensate the donees for losses incurred as stockholders of the Eastern States Securities Corporation as determined by respondent, but was rather an ordinary payment for services actually rendered and that the proportionate stock holdings of each recipient in that corporation were merely used as a basis for the distribution, the amount received in each instance being no more than reasonable compensation for services. As such it is claimed to be allowable under section 23 (a) of the Revenue Act of 1936. [1]
*317 In his contention that the payment was not ordinary, respondent points out that the majority of the recipients were not even employees of petitioner but of subsidiary corporations, to which they rendered service and by which they were paid their salaries. In reply to this, petitioner argues that the recipients were employees of Koppers Industry and in consequence should be considered as employees of petitioner since the services rendered by them to the subsidiaries were reflected in and were the primary basic source of petitioner's income as drawn from such subsidiaries. Nothing here warrants such disregard of the several corporate entities. Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 77 L. Ed. 399, 53 S. Ct. 198. So, assuming the distribution was made in payment of expenses of petitioner's subsidiary, that payment was voluntary and may well have been, as to petitioner, no more than a capital contribution to its subsidiary. Petitioner argues that the distribution represented compensation for services from 1932 to 1936 and to take the place of bonus payments discontinued and salaries reduced in that period. If such were the fact, of course, the circumstances that the *318 service was rendered in a year prior to payment of the bonuses would not bar its allowance. Ox Fibre Brush Co. v. Blair, 32 F.2d 42; affd., 281 U.S. 115, 74 L. Ed. 733, 50 S. Ct. 273. Such a fact can not, however, be reconciled with the circumstances surrounding the distribution. Some of the recipients left the service of Koppers Industry prior to 1932. They had no loss of bonus or reduction of salary through occurrences subsequent to that date. Other payments were to widows of deceased employees. One was to a corporate trustee under the will of a deceased employee, holding stock in Eastern States Securities Coorporation. The criterion for participation in the distribution appears to have been ownership of stock in this corporation. The participants constitute all of the stockholders. The amount distributed to each was in exact proportion to the stock holdings of each and wholly without reference to the salaries received. One employee on a salary of $9,600 received $43,883.70 while another with a salary of $15,943 received $754 and the president of petitioner on a salary of $60,000 received $9,345.38, only seven dollars more than was paid to an employee *319 with a salary of $5,200. The salaries paid employees are usually the measure of the comparative values of their services to the employer. This fact seems to have been recognized by the Koppers Industry. The bonus payments prior to as well as subsequent to 1936 have been of one or more months' salary and it is indicative that these were made by the corporation employing the recipient. As far as the record shows the distribution here in question was the first and only payment of a so-called bonus by petitioner to employees of the subsidiary companies of Koppers Industry. In the light of these facts can it be said that the payment, for which it is not contended that a legal or moral obligation existed, was ordinary and necessary and constituted compensation for services rendered? Not only was it not "ordinary" in our opinion, but there is no evidence that it was "necessary". The petitioner was not faced with a condition as in Robert Gaylord, Inc., 41 B.T.A. 1119, where the safety of the business of the taxpayer and its continuance of operation was in jeopardy unless the payment was made. It may well be that the payment was justified from the standpoint *320 of business judgment and that the Koppers Industry and petitioner, as the parent organization received a definite benefit as a result of the expenditure, but that alone does not justify its deduction. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8; Western Maryland Dairy Corp., 32 B.T.A. 769; Deputy v. Du Pont, 308 U.S. 488, 60 S. Ct. 363, 84 L. Ed. 416; A. Giurlani & Bro., 41 B.T.A. 403; affd., 119 F.2d 852. Respondent has determined that the distribution involved here was not an ordinary and necessary expense of petitioner and so denied its deduction as such under section 23 (a), supra. We think petitioner has not only failed to establish error in this factual determination but that the record affirmatively supports it. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME In computing net income there shall be allowed as deductions: (a) Expenses. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *.↩