CELANESE CORPORATION and
Consolidated Subsidiaries,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 142–82T.

United States Claims Court.

July 3, 1985.

Myron C. Baum, Washington, D.C., for plaintiff; Patricia G. Lewis and Caplin & Drysdale, Chartered, Washington, D.C., of counsel.

Israel D. Shetreat, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant; Theodore D. Peyser, Washington, D.C., of counsel.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

This is a suit for refund of $19,075,994 in income tax, plus interest. The question at issue on these motions is the right of plaintiff, Celanese Corporation, to deduct $58,364,636 as a bad debt loss, ordinary loss or business expense on its 1969 federal income tax return, as a result of having paid that sum in satisfaction of its guarantees of the debts of an Italian subsidiary corporation during that year.

### *Statement*

Since defendant's motion for summary judgment relies wholly on plaintiff's complaint and the sworn statements and exhibits in plaintiff's pretrial submission, and since both defendant's motion and defendant's opposition to plaintiff's motion for partial summary judgment are not supported by any affidavits or other proper evidentiary materials which might dispute plaintiff's allegations of evidentiary facts, for purposes of decision on the instant motions, the facts set forth herein are likewise based upon plaintiff's complaint, the evidentiary facts set forth in plaintiff's sworn pretrial submission, and the documentary exhibits attached thereto.

During the 1950's, the Italian government established a program to foster private industrial development in southern Italy and Sicily, and created various agencies to assist in this endeavor by providing financing, interest subsidies, grants and tax concessions. Among these agencies was the Istituto Regionale per il Finanziamento alle Industrie in Sicilia (IRFIS).

During this same period a large Italian chemical and fiber company organized a corporation known as Societa Industriale Agricola per la produzione di Cellulosa da Eucalipto, S.p.A. (SIACE) to produce wood pulp and paper products from eucalyptus trees in Sicily. In 1962 IRFIS lent SIACE a total of $12 million at low interest rates to finance construction of a board and pulp mill. By 1965 SIACE had acquired, under arrangements with the Sicilian government, extensive acreage reforested with fast-growing eucalyptus trees.

In 1965 SIACE came to the attention of Celanese Corporation (Celanese) as a possible acquisition in its diversification program, to provide a marketing outlet for wood pulp produced by a Canadian subsidiary of Celanese, a means of entering the growing European paper market, and additional forestry resources. Studies by Celanese and its consultants indicated that SIACE would quickly produce profitable returns with only a modest Celanese investment. During that same year, Celanese organized Radio Hill Investment Corporation (Radio Hill), and the latter acquired 71 percent of the stock of SIACE.

At the time Celanese acquired its SIACE stock, the latter's facilities were still under construction. In the following year, it became apparent that additional low cost financing was needed to complete construction of the planned paper manufacturing complex. Negotiations with IRFIS produc-

ed an agreement by IRFIS to lend SIACE an additional $16 million, again at low interest rates. Both the 1962 and 1966 loans were secured by a mortgage on SIACE's plant and real property. Each loan was repayable in installments over a 10-year period, beginning 5 years after the execution of the relevant loan agreement. In addition, the 1966 loan was conditioned on Celanese giving IRFIS a $12 million guarantee in the form of a bank letter of credit, which it in fact did.

From 1966 through 1968, despite the favorable projections, SIACE encountered numerous difficulties in completing its plant and getting it fully operational. Construction delays, equipment malfunctions, quality problems, and a substantial drop in market price for paper products combined to keep SIACE sales far below projected levels. It also became apparent that SIACE required still additional financing. This financing was obtained through loans or so-called "overdraft facilities" from at least five Italian banks and another Italian government development agency, Istituto Mobiliare Italiano (IMI).

These overdrafts initially were secured by Radio Hill guarantees, backed up by so-called working capital agreements whereby Celanese undertook to maintain Radio Hill's working capital at a minimum of $1,000 (i.e., to cover any guarantee obligations) and to limit Radio Hill's business to the ownership of the SIACE's stock. These agreements, which were expressly for the benefit of the lenders, were utilized because of limitations under Celanese's long-term debt indentures and financial statement concerns. In 1968, due to restrictions imposed on foreign investments by Americans pursuant to United States Executive Order 11,387 (3 C.F.R. § 702 (1966–70 comp.)), and due to losses suffered by Italian banks as the result of the failure of Raytheon Company, an American corporation, to honor its alleged obligations in Italy, the banks insisted upon direct guarantees to replace the working capital agreements and for any new loans. Accordingly, Celanese ultimately provided such direct guarantees.

From the time of the acquisition in 1965 until the end of 1968, Celanese made capital contributions to SIACE (through Radio Hill) totalling $16.9 million, while SIACE's minority shareholders contributed $0.8 million. At the end of 1968, SIACE owed short-term debt of $43 million and long-term debt of approximately $30 million. Celanese chose to make additional funds available to SIACE through loan guarantees rather than investment because guarantees directly benefited the lenders whereas capital contributions were available to general creditors, and because Celanese's ability to make capital contributions was severely restricted by Executive Order 11,-387 and regulations of the U.S. Office of Foreign Direct Investment.

As of the end of 1968, SIACE had incurred losses aggregating well over $18 million, and Celanese had written off another $15.8 which SIACE had capitalized on its books as pre-operating costs. Its net loss for 1968 was $11.6 million on sales of $5 million. A report by a key Celanese official concluded that it was doubtful that the business could be made viable and that Celanese should divest itself of SIACE. Following this report, Celanese retained consultants to study the operations of SIACE.

In the meantime, Celanese became concerned about the possibility of bankruptcy of SIACE, and the consequent cost and danger to Celanese's own financial reputation, labor turmoil, and effects on its other business operations. Celanese's management determined that interim financial arrangements were necessary to avoid default by SIACE, and, accordingly, it approved additional guarantees for SIACE's borrowings totalling $44 million.

The reports submitted by the consultants in early 1969 concluded that SIACE might, under one strategy, realize an annual operating profit of one to two million dollars within 2 to 4 years if Celanese made additional capital investments of $15 to $20 million and cash advances of up to $27 million to cover losses and interest charges.

The conclusion was that such costs were not economically justified in light of the limited potential. Accordingly, in February 1969, Celanese's board of directors resolved to divest its interest in Celanese and establish a $75 million reserve for estimated losses on the projected divestment.

While seeking purchasers for the SIACE's stock or assets in the ensuing months, Celanese representatives conducted negotiations with officials of various Italian government agencies, including IRFIS.

Finally, an agreement was entered into with a corporation known as Siciliana Cellulosa e Carta S.p.A. (SICECA) under which it was agreed that Radio Hill would transfer its stock in SIACE (amounting by this time to an 88 percent interest due to additional purchases and the failure of minority stockholders to make additional capital contributions) to SICECA. SICECA undertook to get IRFIS to reduce Celanese's guarantee on the IRFIS 1966 loan from $12 million to $8 million, provided that Celanese agreed to pay all other guarantee obligations in full. However, before agreeing to reduce Celanese's guarantee liability, IRFIS insisted that the guarantee be paid within 60 days, that it receive an option from SICECA to acquire 50 percent or more of the SIACE shares transferred to SICECA, and also that all of the shares so transferred be pledged to IRFIS as security for its outstanding loans.

The divestment agreement provides that, "as of the date of each satisfaction of a guarantee obligation * * * [Celanese] will be deemed to have waived its rights of subrogation, if any, with respect thereto in favor of SICECA." This provision was amended at the closing to provide that Celanese would be deemed to have "waived and assigned" its rights of subrogation "in favor of Italholding Anstalt, an affiliate of SICECA", as of the date of each such satisfaction. A major reason for this amendment was the fear that SIACE would be deemed to have realized taxable income in the amount of the guarantees paid by Celanese if the subrogation rights

were cancelled, contributed to SIACE, or waived in favor of SICECA.

The closing of the divestment transaction took place on May 12, 1969, at which time the stock of SIACE was transferred to SICECA, and Celanese executed an Assignment of Claim by which it assigned to Italholding the rights of subrogation that may have come or that might come in the future from Celanese's honoring of its guarantees. The subrogation rights so assigned were expressly provided to be nonalienable except to SIACE, without the consent of IRFIS, and were pledged to Banco di Sicilia (a creditor bank) for the benefit of IRFIS. This avoided the necessity of IRFIS competing with any other creditor who might obtain subrogation rights.

In 1971 and 1972 Italholding contributed the subrogation rights to SIACE to restore SIACE's book value after additional losses after the divestment.

Under Italian law, any transfers of stock from a foreign company (Radio Hill) to an Italian company (SICECA) had to be made through an Italian bank, which in turn was required to certify that the purchase price of the shares was fair. In compliance with this requirement, Lavoro, a bank owned by the Italian government, executed a document delivered at the closing, which certified that the SIACE stock had no value, and the transfer tax document for the shares described the consideration as one lira, or approximately one-sixth of a cent.

By June 30, 1969, Celanese had discharged all of its guarantee obligations by payments totalling $58,364,636. On December 5, 1969, another Italian government agency, Ente Siciliano per la Promozione Industriale (ESPI) was designated as assignee of IRFIS's option to acquire the SIACE stock, and in the following month it acquired at least 52 percent of such stock. ESPI has since been the majority (and ultimately sole) shareholder of SIACE. SIACE, which was closed down at the time of the divestment, did not resume operations until 1972 because of labor and governmental problems. Thereafter, SIACE has operated on a scaled down basis as a plant

owned by the Italian government, and has incurred losses totalling $271 million through 1981.

On its 1969 federal income tax return, Celanese deducted the $58,364,636 as losses incurred with respect to its guarantee obligation of SIACE's debts. Of this amount, the Internal Revenue Service (I.R.S.) allowed $31,932,228 as a deduction under I.R.C. §§ 162 (Trade or Business Expenses) and 165 (Losses) and disallowed the remaining $26,432,408. In this suit plaintiff seeks a tax refund on the ground that the disallowance was improper. In its answer defendant claims an offset on the theory that I.R.S.' allowance of the $31,-932,228 deduction was erroneous.

### Discussion

### I

#### Defendant's Motion for Summary Judgment

■ A. In its opening brief in support of its motion for summary judgment, defendant contends (1) that as a matter of law plaintiff is not entitled to the $26,432,-408 deduction for a bad debt because Celanese, having waived and assigned its right of subrogation as of the closing date of the divestment agreement, May 5, 1969, never became a creditor of SIACE and thus did not incur a deductible bad debt loss. In such brief, defendant does not indicate what it deems to be the proper treatment of the $26,432,408 or the $58,364,636 total of guarantee payments made by Celanese. However, in its reply brief, defendant makes the additional contentions that Celanese is not entitled to a bad debt loss deduction because: (2) it contributed its subrogation rights to SIACE's capital; (3) alternatively, Celanese's waiver or assignment of its subrogation rights was a transfer of a capital asset in exchange for IR-

FIS's waiver of its right to collect an additional $4 million in guarantee payments from Celanese, and, therefore, Celanese at most incurred a capital loss deductible only against capital gain; and, (4) in any event the loan guarantees were not really debt but were risk capital invested by Celanese in its subsidiary, SIACE, and such loss likewise may only be recognized as a capital loss.

However, for reasons stated hereinafter, it is concluded that defendant is not entitled to summary judgment on any of these grounds.

First, defendant's argument, that to be entitled to a bad debt loss for payment of a guaranteed debt the guarantor must retain a right of subrogation against the debtor, is based on too restrictive a reading of the decision in *Putnam v. Commissioner*, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956). There, the taxpayer was a lawyer, who, in 1945, in a venture not connected with his law practice, organized a newspaper publishing company, originally subscribing to one-third of the stock and eventually acquiring all of it before abandoning the venture in 1947 and liquidating its assets. Because the proceeds of sale of the assets were insufficient to pay the full amount due to a bank on two notes given by the corporation and guaranteed by Putnam for monies borrowed in 1946 and 1947, in 1948 he was required to pay the notes to the bank pursuant to his guarantee. Putnam contended that he was entitled to a deduction from his 1948 income for losses incurred in a transaction entered into for profit, though not connected with his trade or business, pursuant to § 23(e)(2) of the Internal Revenue Code of 1939 [1] (the predecessor of 1954 I.R.C. § 165(a)). However, the Commissioner of Internal Revenue de-

---

1. *Putnam,* 352 U.S. at 83, 77 S.Ct. at 175.
   SEC. 23. DEDUCTIONS FROM GROSS INCOME.
   In computing net income there shall be allowed as deductions:
     *   *   *   *   *   *
   (e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during

the taxable year and not compensated for by insurance or otherwise—
  *   *   *   *   *   *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *.

termined that the loss was a nonbusiness bad debt within the meaning of § 23(k)(4) of the 1939 Code [2] (the predecessor of the 1954 Code § 166(d)) and therefore deductible only as a short-term capital loss.

The court ruled that Congress intended that an individual guarantor's loss from the payment of his nonbusiness guarantees should fall exclusively within the bad debt section with its limited deductibility rather than the general loss section. In support of its conclusion the court reasoned (*Putnam*, 352 U.S. at 85–86, 77 S.Ct. at 176–177):

■ The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes. Thus, the loss sustained by the guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt.

■ This has been consistently recognized in the administrative and judicial construction of the Internal Revenue laws which, until the decision of the Court of Appeals in conflict with the decision below, have always treated guarantors' losses as bad debt losses.

■ The Congress recently confirmed this treatment in the Internal Revenue Code of 1954 by providing that a payment by a non-corporate taxpayer in discharge of his obligation as guarantor of certain non-corporate obligations "shall be treated as a debt." [Citations omitted.]

Putnam contended that if the guarantor became a creditor by acquiring the debt by subrogation upon payment of the guarantee, the debt was worthless when acquired and therefore could not have become bad after he acquired it, but the court rejected this argument because (*Putnam*, 352 U.S. at 88–89, 77 S.Ct. at 178):

Under the doctrine of subrogation, payment by the guarantor * * * is treated not as creating a new debt and extinguishing the original debt, but as preserving the original debt and merely substituting the guarantor for the creditor. The reality of the situation is that the debt is an asset of full value in the creditor's hands because backed by the guaranty. The debtor is usually not able to reimburse the guarantor and in such cases that value is lost at the instant that the guarantor pays the creditor. But that this instant is also the instant when the guarantor acquires the debt cannot obscure the fact that the debt "becomes" worthless in his hands.

Defendant concedes that "had it not been for the renunciation of Celanese's subrogation rights, plaintiff would have been entitled to deduct the $58,364,636 in question as a bad debt pursuant to Section 166", but argues that because Celanese assigned away the subrogation rights contemporaneously with the payment of its guarantee, it never acquired a debt owed by SIACE, which could become worthless during the taxable year 1969. It further argues that because in *Putnam* the Supreme Court also stated that "the statutory scheme is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all" (*Putnam*, 352 U.S. at 88, 77 S.Ct. at 178), the loss attributable to the payment of the guarantee is not deductible at all.

---

2. *Id.* at 84, 77 S.Ct. at 175–176.
 SEC. 23. DEDUCTIONS FROM GROSS INCOME.
 *  *  *  *  *  *
 (k) BAD DEBTS.—
 *  *  *  *  *  *
 (4) Non-Business Debts.—In the case of a taxpayer, other than a corporation, if a nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

There are multiple fallacies in defendant's reasoning. First, the decision in Putnam did not depend wholly upon the subrogation theory. The decision also rests upon the broader ground that (*Putnam,* 352 U.S. at 92–93, 77 S.Ct. at 180)—

> There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same, and are accomplished by § 23(k)(4).[21]

---

21. Upon this ground, contrary to the holding in *Fox v. Commissioner,* 190 F.2d 101, the guarantor's nonbusiness loss would receive short-term capital loss treatment despite the nonexistence of the debtor at the time of the guarantor's payment to the creditor.[3]

That the *Putnam* holding does not depend on the acquisition of a right of subrogation is underscored by the lack of substantiality of subrogation rights in the *Putnam* case itself, because the assets of the debtor corporation had been liquidated prior to satisfaction of the guarantees and the corporation was insolvent and inactive. It is further emphasized by the court's statement that Congress had recently confirmed the administrative and judicial construction of the Internal Revenue laws which had always treated guarantors' losses as bad debt losses, by providing in the Internal Revenue Code of 1954 that a payment by a noncorporate taxpayer in discharge of his obligation as guarantor of certain noncorporate obligations "shall be treated as a debt." [4]

---

3. In *Fox v. Commissioner,* 190 F.2d 101, 105 (2d Cir.1951), disapproved by the Supreme Court, the court had held that payment made by a wife on a written guarantee of the debts of her husband could not give rise to a bad debt deduction because the husband was dead and his estate was insolvent and closed at the time of the payments of the guarantee, and hence the right of subrogation was worthless.

4. SEC. 166. BAD DEBTS.

    \*     \*     \*     \*     \*     \*

(f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in dis-

Second, circuit court decisions since *Putnam* have uniformly held that the existence of a valuable right of subrogation is not required for the treatment of a guaranteed payment as a bad debt loss. *In Re Vaughan, Jr.,* 719 F.2d 196 (6th Cir.1983); *Horne v. Commissioner,* 523 F.2d 1363 (9th Cir.1975), *cert. denied,* 439 U.S. 892, 99 S.Ct. 249, 58 L.Ed.2d 237 (1978); *Stratmore v. United States,* 420 F.2d 461 (3rd Cir.), *cert. denied,* 398 U.S. 951, 90 S.Ct. 1870, 26 L.Ed.2d 291 (1970); *Martin v. Commissioner,* 52 T.C. 140, 146 (1969), *aff'd, per curiam,* 424 F.2d 1368 (9th Cir.), *cert. denied,* 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970).

The reasoning of these cases is highly persuasive. A preoccupation with the presence or absence of subrogation rights would have several undesirable consequences. First, it would allow differences in state law regarding subrogation to result in disparate tax treatment of taxpayers in different states who are in similar economic positions. Second, it would permit a taxpayer to convert a capital loss into an ordinary loss almost at will. In most states, subrogation is not permitted unless the guarantor pays his liability in full. By paying all but a minimum amount of his obligation, a guarantor would be able to preclude any acquisition of subrogation rights and thus deal himself preferential ordinary loss treatment. Third, it would be arbitrarily discriminatory in that the guarantor who made full payment would be limited to a short-term capital loss deduction, while the guarantor who made only partial payment would enjoy a fully deduct-

charge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.

This section was repealed by Pub.L. 94–455, § 605(a), 90 Stat. 1525, 1575 (1976).

ible loss. It is hardly likely that Congress would have intended to allow such formalistic distinctions to determine the nature and amount of income tax deductions.

Finally, even if *Putnam* could be read to place such importance on the existence or nonexistence of subrogation rights, that should not be determinative herein. As previously noted, *Putnam* involved an interpretation of provisions of the 1939 Code, whereas the instant case involves the interpretation and application of provisions of the 1954 Code. As the Supreme Court noted in *Putnam*, 352 U.S. at 86, 77 S.Ct. at 177, Congress confirmed bad debt treatment of a guarantor's loss in § 166(f) of the 1954 Code by providing that a payment by a noncorporate taxpayer in discharge of his obligation as guarantor of a noncorporate obligation, the proceeds of which were used in the trade or business of the borrower should be treated as a debt becoming worthless within the taxable year without regard to the short-term capital loss treatment otherwise prescribed for losses resulting from nonbusiness bad debts. This section was in effect during the taxable year at issue. What is significant about § 166(f) for purposes of the instant case is that (a) nowhere did it require as a condition for such treatment that there be a right of subrogation, and (b) the subsection applied only to a taxpayer "other than a corporation", plainly implying that all bad debt losses of a corporation are business losses and hence fully deductible either under § 165 or § 166.

B. Defendant's second argument, that Celanese contributed its subrogation rights to SIACE's capital and thus had no loss of any kind, is likewise insufficient to support defendant's motion for summary judgment. To begin with, Celanese did not in fact contribute its subrogation rights to the capital of SIACE or cancel the underlying indebtness. Instead, the parties structured the transactions so as to preserve the underlying debt, subject to IRFIS' control. Celanese assigned the subrogation rights to Italholding with restrictions and they were pledged for the benefit of IRFIS.

Assuming that Italholding's contribution of the subrogation rights to SIACE in 1971 and 1972 in substance completed a contribution by Celanese, unless the rights had actually economic value to Celanese, they merely resulted in a technical improvement of SIACE's balance sheet and not proof that plaintiff gave away the right to recover the $58,364,636 which it had been required to pay out rather than merely lost it.

Defendant relies principally upon two decisions to support its thesis that Celanese's alleged contribution of its subrogation rights deprived plaintiff of a loss deduction: *Bratton v. Commissioner*, 217 F.2d 486 (6th Cir.1954), and *Lidgerwood Mfg. Co. v. Commissioner*, 229 F.2d 241 (2d Cir.), *cert. denied*, 351 U.S. 951, 76 S.Ct. 848, 100 L.Ed. 1475 (1956). However, neither of these authorities is sufficiently persuasive of the result defendant urges on the facts herein.

In *Bratton*, the taxpayer, as an integral part of his business, guaranteed to banks and other creditors the debts of a corporation, which he controlled. In 1950 after he had paid the corporation's guaranteed creditors, he decided to rehabilitate the corporation's business by changing its activities, and by inducing a new and experienced individual to become general manager. In return, the taxpayer agreed to sell to the new manager one-third of his stock in the corporation for $1 and further voluntarily released the corporation from any claim for the amounts taxpayer had loaned and advanced for it. The court stated that "[i]t was well recognized that where a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction generally amounts to a contribution to the capital of the corporation." *Bratton*, 217 F.2d at 489. Under these circumstances, the court held, to the extent the taxpayer released the corporation's indebtness to him resulting from the plaintiff's payment of the corporation's debts, the payments were converted to a capital contribution and could not be deducted either as a bad debt or a business loss. *Id.*

However, *Bratton* is distinguishable from the instant case in several important respects. First, the taxpayer remained a shareholder of the corporation and intended to benefit both himself and the other stockholder, the new manager, by his contribution of his subrogation rights to the corporation, whereas in the instant case Celanese did not remain a stockholder of SIACE. Second, there was no finding that Bratton's claim against his corporation had no value, and there were findings that both Bratton and his new manager expected to convert the corporation to profitability, in part as a result of the relinquishment of the debt claim, and indeed at the time of trial in 1952 the corporation was in fact operating profitably; whereas in the instant case defendant has introduced no substantial evidence that Celanese's claim had substantial value or of what that value was. Finally, in holding that a bad debt deduction was not allowable where the prime obligor was no longer in existence at the time the guarantor was called upon to pay, the court relied upon the decision in *Fox v. Commissioner*, 190 F.2d 101 (2d Cir.1951), which the Supreme Court repudiated in *Putnam*, 352 U.S. at 93 n. 21, 77 S.Ct. at 180 n. 21. [*See* p. 462, *supra.*]

In *Giblin v. Commissioner*, 227 F.2d 692, 698–99 (5th Cir.1955), the court rejected the government's position, which the government asserted was supported by *Bratton*, that a gratuitous release by a taxpayer of an obligation owing to him from a corporation of which he is a stockholder, necessarily precludes him from claiming a deduction based on the existence of this obligation. It held that even if the forgiveness of indebtedness was income to the corporation, it would not necessarily mean that the stockholder was precluded from taking a deduction for the worthlessness of the subrogation claim. *Id.*

In *Mayo v. Commissioner*, 16 T.C.M. 49 (1957), the Tax Court held that a stockholder was not precluded from taking a deduction for a bad debt owing to him by his corporation on the theory that his cancellation of the indebtedness was a contribution to capital, where the corporation was hopelessly insolvent, efforts were being made to sell the business, the cancellation was intended to facilitate the sale, in view of the insolvency the cancellation did not enhance the value of the taxpayer's stock, and the cancellation simply reflected the practical judgment that an indebtedness in that amount was uncollectible. And *see also Deeds v. Commissioner*, 47 F.2d 695 (6th Cir.1931).

Defendant's reliance upon *Lidgerwood Mfg. Co.* is equally misplaced. There, in 1946, the taxpayer corporation voluntarily cancelled indebtedness owing to it by two wholly owned subsidiary corporations in exchange for additional shares of the debtors' common stock. Appropriate entries in the books of the respective corporations were made to reflect reductions in indebtedness of the subsidiaries and increases in capital investment by the parent. The purpose of the debt cancellations was to enable the subsidiaries to obtain needed bank loans, which they did obtain after the cancellations. In its tax return for 1946, the year at issue, the taxpayer claimed no deduction for bad debts but subsequently amended the returns to claim such deduction. Although the court held that the cancellations of indebtedness by the stockholder were capital contributions barring the stockholder from taking a bad debt deduction, its reasoning is not clear. On the one hand, it expressed its agreement with *Bratton*, stating that even if the subsidiaries were insolvent both before and after the cancellations, "[w]here a parent corporation voluntarily cancels a debt owing by its subsidiary in order to improve the latter's financial position so that it may continue in business", the cancellation should be held a capital contribution precluding the parent from claiming it as a bad deduction. *Lidgerwood Mfg. Co.*, 229 F.2d at 243. On the other hand, it stated, "The cancellation of indebtedness by a creditor may be either a gift, a contribution to capital, if a debtor be a corporation, or a sale of a claim for less than its face value. Determination of which category a particular transaction falls into depends on the facts of the partic-

ular case, and largely on the intent of the creditor." *Id.* at 242. And, as a part of its reasoning, it also stated, "That the petitioner intended it to be a capital contribution is clear, for it not only received stock in exchange for the cancellations but made entries in its books to reflect the transaction as such." *Id.* at 243. Thus, *Lidgerwood* is likewise distinguishable from the instant case by the facts that the debts were cancelled by a continuing stockholder, and that its action clearly indicated the intent by the stockholder that the cancellations of indebtedness by the stockholder be capital contributions in exchange for additional stock, while neither of these facts is present in the current lawsuit.

C. Defendant's argument that Celanese's relinquishment of its right to reimbursement from SIACE of its guarantee payments in return for IRFIS' waiver of its right to collect $4 million of its guarantee from Celanese represented a disposition by Celanese of its debt by sale or exchange, giving rise only to a capital loss and thus prevented it from having a bad debt, likewise fails to support summary judgment in favor of defendant.

■■■ First, it is not at all clear that there was a sale or exchange of Celanese's right to reimbursement from SIACE. The entire transaction more resembles a composition between debtors and creditors than an exchange. As far as plaintiff is concerned, it ended up having to pay $58,364,-636 rather than $62,364,636. The record does not reveal the receipt of anything by Celanese in exchange for the $58,364,636. If the parties believe that the original debtor is unable to pay any part of the amount owing, a composition between a guarantor and the creditors to which he is liable, as the result of which the guarantor pays less than the full amount of his guarantee and gives up his right to compete with the creditors for the debtor's remaining assets, involves no elements of a sale or exchange but represents merely the recognition of a bad debt. *See Mitchell v. Commissioner,* 187 F.2d 706 (2d Cir.1951). Moreover, even if it be deemed that Celanese did transfer

its claim against SIACE in a transaction constituting a sale or exchange, if the claim was worthless at the time of the transfer it would not nullify the taxpayer's right to a deduction for the worthlessness of a debt. If the taxpayer subsequently made a partial recovery thereon, this would constitute income but would not change the right to the original deduction. *Mitchell,* 187 F.2d at 706–07; *Levine v. Commissioner,* 31 T.C. 1121 (1959); *see also Lorch v. Commissioner,* 70 T.C. 674, 680 (1978), *aff'd,* 605 F.2d 657 (2d Cir.1979), *cert. denied,* 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980).

Defendant relies upon *Von Hoffmann Corp. v. Commissioner,* 253 F.2d 828 (8th Cir.1958), for the proposition that where a creditor transfers a debt to a third party for consideration it is necessarily a sale or exchange of a capital asset, giving rise only to a capital loss deduction and not a bad debt deduction. But that case is clearly distinguishable on its facts. There, the taxpayer corporation organized a new subsidiary corporation to sell business systems and forms. The subsidiary fared poorly, and 18 months later, in 1951, the taxpayer sold all of the subsidiary's stock to a Mr. Smith for $10,000, the amount which he had invested in the subsidiary. However, the taxpayer retained a $65,000 demand note for prior loans it had made to the subsidiary "because * * * it retained some hope that, by reason of Smith's purchase, all or a substantial part of its account * * might be repaid." *Von Hoffmann,* 253 F.2d at 829. In 1952 Smith concluded that the subsidiary's existing business was a failure and that it could not repay the loans, and he offered to buy the note from the taxpayer for $500, the amount Smith estimated could be recovered thereon were the company to enter bankruptcy. The taxpayer agreed and sold the note to Smith for $500, claiming a bad debt deduction of $64,500 for 1952. The Eighth Circuit treated the claimed deduction as one for a partial bad debt, which under the applicable statute (1939 I.R.C. § 23(k)(1)), was limited to "an amount not in excess of the part charged off within the taxable year." It

found that the charge-off was made after the taxpayer had arranged for the sale. Under the circumstances, it held, the taxpayer could not charge off a debt he no longer owned. Since the defendant has not shown that the debt herein was not totally worthless, since the claim herein is not for partial worthlessness but for total worthlessness, with respect to which § 166 does not require a charge-off, and since the taxpayer here received nothing for giving up its claims for reimbursement of the $58,-364,636, *Von Hoffmann* is inapposite.

D. Defendant's final contention, that the loan guarantees were not bona fide obligations but were risk capital, is not conclusively established by such evidence as could warrant summary judgment in favor of defendant. While it is true that a capital investment can be made in the form of a loan guarantee (*see Casco Bank & Trust Co. v. United States*, 544 F.2d 528, 533–35 (1st Cir.1976), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977); *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712, 722–23 (5th Cir.1972), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1973); and *Santa Anita Consolidated, Inc. v. Commissioner*, 50 T.C. 536, 550 (1968)), here there were substantial (although not conclusive) indicia of debt rather than equity investment. There were bona fide business reasons supporting the guarantees. The formal instruments clearly reflected debt. The obligations were unconditional. SIACE, the debtor, had substantial capital invested in it by plaintiff and others. Neither the guaranteed debts nor the claims of the guarantor were subordinated to other debts. Other creditors also made substantial loans to the debtor during the years in issue, without benefit of security or guarantee. Evidence produced by plaintiff and not contradicted by defendant's evidence showed that Celanese did have expectations of repayment at the time it entered into at least some of its guarantees. The evidence did not reflect at the time the guarantees were made repayment was wholly dependent on the success of the SIACE venture, since SIACE had valuable assets, such as land and tim-

ber, which a guarantor might well have thought available as a possible source of funds for repayment. Finally, at the time Celanese made most of its guarantees, it was not a 100 percent shareholder of SIACE, and therefore the guarantees were not in proportion to ownership.

## II

*Plaintiff's cross-motion for partial summary judgment*

Plaintiff's claim to the $58,364,636 in deductions is based on three alternative theories that there were: (1) Bad debts pursuant to I.R.C. § 166, resulting from the payment of its guarantees of SIACE's debts; (2) Business losses under I.R.C. § 165 attributable to payment of the guarantees; (3) Business expenses pursuant to I.R.C. § 162. However, on the present state of the record, it cannot be concluded that there is no genuine issue as to any fact material to any of such theories so as to entitle plaintiff to judgment as a matter of law.

A. With respect to the bad debt claim, defendant argues that, even on the facts presented by plaintiff, the guarantees were risk capital rather than loans.

■ Although ultimately the question is whether or not the parties intended that the sums paid out were fixed sums repayable in any event, many factors are taken into account in the determination of that question. These include the form of the agreement and the terms used, the actual intent of the parties with respect to repayment, whether there is a fixed date for repayment of principal, the relative degree of certainty that the debtor can repay the principal, whether interest is provided for, whether the advances were used for permanent capital for the borrower or to fill a temporary need, whether the stated capital is adequate for the conduct of the business, whether the claim is secured, whether there is a business purpose for the form used, and whether a disinterested third party would have made the loans or extended the guarantees involved on the same terms.

While the ultimate determination of whether a claim is debt or equity may be a question of law (*see Scriptomatic, Inc. v. United States*, 555 F.2d 364, 372 n. 13 (3rd Cir.1977); and *Tyler v. Tomlinson*, 414 F.2d 844 (5th Cir.1969)), to the extent it requires inferences to be drawn from the evidence as to design, motives or intent, the inquiry is still factual. *Chared Corp. v. United States*, 446 F.2d 745 (5th Cir. 1971); *In Re Lane*, 742 F.2d 1311, 1320 (11th Cir.1984). Furthermore, in this circuit at least the question of intent to create debt or equity "is basically a question of fact, to be determined in the light of all the facts and circumstances of the particular case." *Electronic Modules Corp. v. United States*, 695 F.2d 1367, 1371 (Fed.Cir. 1982).

Since the guarantees were made by a controlling stockholder for the benefit of its subsidiary, without evidence of consideration therefor, except the promise of repayment by the debtor, which, at the times the guarantees would be called upon would already have been unable to pay its primary creditors, it is difficult to conclude on the present record that the parties unequivocally intended a debt and not an additional investment. *Cf. Casco Bank & Trust Co.*, 544 F.2d at 533;[5] *In Re Lane*, 742 F.2d at 1319; *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712 (5th Cir.1972), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 683, 34 L.Ed.2d 664 (1973).

Furthermore, plaintiff's sworn pretrial submissions show that most of the guarantees were executed by plaintiff from various dates in the fall of 1968 and during 1969 when SIACE had already incurred large operating losses and plaintiff was in the process of exploring the possibility of divesting itself of SIACE's stock, liquidating its assets or having it initiate voluntary bankruptcy proceedings. Plaintiff's pretrial submissions state in part:

150. In late 1968, Celanese became sufficiently concerned about the possible bankruptcy of SIACE and a consequent default under the CIC credit agreements that it decided to move Radio Hill and SIACE out of the CIC group [Celanese's wholly-owned international financing subsidiary]. * * *

151. Celanese management was also concerned that publicity attendant on a collapse of SIACE and unfavorable market reaction thereto might increase the risk that Celanese could become a target for a takeover. This would not only be undesirable in itself but might also, *inter alia*, restrict Celanese's ability to devote needed time to the SIACE situation.

152. Crucial to Celanese's planning at this point was the making of interim financial arrangements to avoid default by SIACE and its consequences until all options could be reviewed and a decision made. Observations of the Raytheon affair * * * had impressed upon Celanese management the need to maintain control of the SIACE situation and to avoid triggering local reactions in Sicily that would take the initiative away from Celanese in dealing with the situation. Celanese management felt that its ability to dispose of SIACE with minimal adverse publicity and loss depended on keeping SIACE in funds sufficient to avoid creditors' calls which might result in bankruptcy proceedings and labor turmoil. Thus, continued and increased guarantee arrangements were necessary to preserve Celanese's control over the situation.

153. With these objectives in mind, the Celanese board of directors held a

---

**5.** The court stated in *Casco Bank & Trust Co.*, 544 F.2d at 533:

Preston was expected to put up his own money only if M & P should be in default, by which time any right which Preston would acquire against M & P, whether accruing by subrogation or otherwise, would be more theoretical than real. Thus, we do not see the realities of the transaction as at any time based on the creation of a serious debtor-creditor relationship between Preston and his company. We think the true character of the indemnity agreement is similar to the personal guarantee made by a corporate officer and chief shareholder to creditors of the corporation described by Judge Simpson in *Plantation Patterns, Inc. v. Commissioner* * * *.

special meeting on January 8, 1969, to authorize additional guarantees of SI-ACE borrowings. * * *

Surely these allegations raise serious questions as to whether plaintiff intended a real loan repayable by SIACE in any event, when plaintiff guaranteed SIACE's debts.

In sum, the balancing of all the facts and circumstances required by *Electronic Modules Corp.* and the cases cited therein to determine whether the parties really intended debts rather than additional investments in plaintiff's subsidiary, SIACE, cannot be answered conclusively merely from the allegation of plaintiff's sworn pretrial submissions.

Moreover, no allegations of plaintiff's pretrial submissions conclusively establish the worthlessness of plaintiff's claims against SIACE upon plaintiff's payment of its guarantees of SIACE's debts. There are allegations that during 1969 SIACE was in dire straits and that its *stock* may have been worthless, but they do not establish that there were no assets from which a creditor could have collected a judgment in whole or in part.

Indeed, there are allegations in plaintiff's briefs which support inferences to the contrary. For example, in the statement of facts in its opening brief (p. 7), plaintiff states that reports submitted by consultants in early 1969 conclude that SIACE might under one strategy realize an annual operating profit of $1–2 million within 2 to 4 years if Celanese made additional capital investments. At another place (p. 8), plaintiff states that before agreeing to reduce Celanese's guarantee liability, IRFIS insisted that it receive an option to acquire 50 percent or more of the SIACE shares and that such shares be pledged to IRFIS as security for its outstanding loans. If SIACE had no value, IRFIS would hardly had wanted its shares as security for outstanding loans.

It is also undisputed that IRFIS agreed to reduce Celanese's guarantee from $12 million to $8 million. There is no explanation as to how that sum was arrived at. It is difficult to conclude that IRFIS gave up $4 million which it could have received without believing that it was receiving a *quid pro quo* of SIACE stock or underlying assets having value.

Plaintiff also alleges (brief p. 10) that, although SIACE was closed from 1969 to 1972 because of labor and governmental problems, it has been operated on a scaled down basis as a plant owned by the Italian government. If the plant was operable at all, it cannot be conclusively presumed to have had no value as of 1969. Plaintiff alleges further (brief p. 25) that IRFIS desired to have Celanese renounce its subrogation rights because IRFIS was concerned that Celanese might succeed to an interest in the property on a par with IRFIS, thus enabling Celanese to interfere with IRFIS' rights as secured creditor. Again, this warrants an inference that the SIACE property had value for creditors.

We have also been told by plaintiff that when Celanese extended some of the guarantees repayment was not dependent wholly upon SIACE's profitably because SIACE had valuable fixed assets such as land and timber. The record does not reflect what happened to such assets and the extent to which they were or were no longer available to pay SIACE's debts to Celanese.

B. Plaintiff's contention that, if it did not sustain a bad debt loss by virtue of the worthlessness of its subrogation claim, it had a deductible business loss under I.R.C. § 165(a) in the amount of the loan guarantees it was required to pay may also be correct, but cannot presently support its motion for summary judgment. For, this contention likewise requires the assumption that the guarantees were not conditional commitments to make additional equity investments in SIACE. If they were such additional investments, they would not be deductible as ordinary losses. Under § 165(g) a corporate taxpayer's loss attributable to the worthlessness of stock is treated as a loss from the sale or exchange of a capital asset, i.e., only deductible to the extent of capital gains. As previously discussed, the debt versus equity question cannot be resolved on the

record supporting plaintiff's motion for summary judgment.

Defendant contends that because the Supreme Court stated in *Putnam*, 352 U.S. at 88, that "the statutory scheme is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all", this bars deduction of a § 165 loss. But the court's statement must be read in context. It was speaking of a non-business bad debt loss of an individual, which was limited by the 1939 Code predecessor of § 166(d) to short-term capital loss treatment. There is no statutory policy against deduction of a guarantee payment loss by a corporate taxpayer if it is not otherwise deductible as a bad debt loss.

This precise issue was decided in favor of the taxpayer, in *United Gas Improvement Co. v. Commissioner*, 240 F.2d 312, 319 (3rd Cir.1956), wherein the court ruled that a corporation's payments, pursuant to guarantees of its subsidiary's dividends, were deductible either as a bad debt or as a loss under the 1939 Code predecessor to § 165(a). It stated (*id.*):

> If these payments may be regarded as having given rise to debts within the meaning of section 23(k) of the Internal Revenue Code of 1939 they would be deductible by this corporate taxpayer as bad debts under section 23(k) of the Internal Revenue Code of 1939. For the limiting provisions of section 23(k)(4) which were enforced in the Putnam case do not apply to a corporation. But we do not need to decide whether these payments may be treated as bad debts. For if they did not give rise to debts they undoubtedly resulted in losses to the taxpayer not compensated for by insurance or otherwise and as such were deductible under section 23(f) of the Internal Revenue Code of 1939 in the year or years in which the losses were sustained.

The same result was reached in *Santa Anita Consolidated, Inc. v. Commissioner*, 50 T.C. 536 (1968), wherein the taxpayer corporation made payments to obtain release from its guarantee obligations. Af-

ter the court decided that in the absence of subrogation rights under state law the taxpayer was not entitled to a bad debt deduction, the court ruled (*id.* at 548):

> Petitioner maintains that it is entitled to deduct the $4,396,000 as a "loss * * * not compensated for by insurance or otherwise" under Code section 165(a) * * *. We agree with petitioner. The $4,396,000 payment to Pacific for release from the guaranty was irretrievably lost in a transaction closed in 1959. Petitioner had no right to compensation for its loss by insurance, subrogation or otherwise. The loss thus meets the requirements of section 165(a). * * * Petitioner, being a corporation, is not subject to the non-business bad debt limitations of section 166(d) or any possible implied disallowance under the provisions for deductions by guarantors (other than corporations) of certain noncorporate obligations in section 166(f).

C. Plaintiff's final argument is that if neither I.R.C. §§ 165 nor 166 apply, then the expenditure of $31,932,228 pursuant to guarantees made by Celanese in late 1968 and early 1969 was deductible under § 162, relating to ordinary and necessary business expenses.

■ The usual rule of law is that a parent corporation's payment of its subsidiary's business expenses is not deductible as an expense of the parent's own business but is a contribution to the capital of or additional investment in the subsidiary. *Transamerica Corp. v. United States*, 7 Cl.Ct. 119, 125 (1984); *South American Gold & Platinum Co. v. Commissioner*, 8 T.C. 1297, 1302, *aff'd per curiam*, 168 F.2d 71 (2d Cir.1948); *Koppers United Co. v. Commissioner*, 2 T.C.M. (CCH) 103, 107 (1943), *aff'd per curiam*, 141 F.2d 1023 (3d Cir.1944); *Esmond Mills v. Commissioner*, 132 F.2d 753, 756–57 (1st Cir.1943). However, plaintiff contends that this rule does not bar its deductions here, because Celanese's own business interests required it to provide additional financial assistance on behalf of SIACE in order to avoid dam-

age to Celanese's own financial reputation and credit and other adverse business consequences which would ensue if SIACE defaulted on its obligations or was declared bankrupt. It asserts that by late 1968 Celanese was aware of SIACE's hopeless financial condition and of the futility from a business and economic standpoint of continuing SIACE's operations, and it did not believe that SIACE's business prospects justified any further financial commitment. Accordingly, it asks the court to infer that Celanese's primary motive in making the guarantees and expending the additional $31,932,228 was to protect its own business interests.

The difficulty with plaintiff's argument is that it asks the court to find conclusively facts with respect to plaintiff's motive and intent without a trial. Questions of motive and intent are not ordinarily resolvable upon motion for summary judgment and in the absence of opportunity for cross-examination. *See Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir.1984); *Empire Electronics Co. v. United States*, 311 F.2d 175, 180 (2d Cir.1962); *Alabama Great So. RR. v. Louisville & Nashville RR. & Son*, 224 F.2d 1, 5 (5th Cir.1955).

Even if plaintiff's sworn pretrial submissions support plaintiff's thesis that Celanese was motivated by the desire to protect its own reputation and credit when it made the late 1968 and 1969 guarantees, in the absence of cross-examination and opportunity to weigh the credibility of the witnesses, whose primary and subjective *motivation must be* determined, the court is not able to assess fairly whether such motives were primary or merely co-existed with the desire of plaintiff to add to and rehabilitate its investment in SIACE.

### Conclusion

In view of the foregoing both defendant's motion for summary judgment and plaintiff's motion for partial summary judgment are denied.